**Billy Allen McCAMEY, Petitioner**

v.

**Christopher EPPS, et al., Respondents.**

**No. 1:06CV294–A–D.**

United States District Court, N.D. Mississippi, Eastern Division.

March 12, 2010.

Jim D. Waide, III, Waide & Associates, PA, Tupelo, MS, for Petitioner.

Frances Patterson Croft, Mississippi Attorney General's Office, Jackson, MS, for Respondents.

### FINAL JUDGMENT

SHARION AYCOCK, District Judge.

With the assistance of counsel, the Petitioner filed this matter pursuant to 28 U.S.C. § 2254 challenging his state court conviction for possession of methamphetamine precursor chemicals and his thirty-three year sentence. The Magistrate Judge held an evidentiary hearing on September 17, 2008. Following the hearing, the Magistrate Judge recommended that the writ of *habeas corpus* should issue for McCamey. Specifically, the Magistrate Judge found that McCamey had been denied a fair trial by impartial jurors; that he was denied the right to be represented by conflict-free counsel; and, that any purported waiver of these rights was invalid.[1] The Magistrate Judge has recommended that McCamey receive a new trial within 120 days or be released from custody.

On February 25, 2010, the Respondents filed Objections to the Report and Recommendation. The Respondents, however, have not identified any new law or additional arguments which have not al-

---

1. The details of McCamey's claims, the Respondents defenses, and all the attendant issues are thoroughly discussed in the Magistrate Judge's Report and Recommendation dated January 22, 2010.

ready been thoroughly considered by the Magistrate Judge. The basis of the Respondents' objections are that McCamey's attorney was not functioning under an "actual conflict of interest" but, rather, there was only a potential conflict.

This issue was comprehensively addressed in the Report and Recommendation and the Judge found that the attorney suffered under three separate but related conflicts of interest. *See* Report and Recommendation, pp. 63–69 (Jan. 22, 2010) (identifying the conflicts and discussing the ramifications). The court agrees with the Magistrate Judge's findings regarding the existence of actual conflicts of interest. These conflicts rendered McCamey's waiver of rights—right to a fair trial and an ineffective assistance of counsel claim invalid. The court can find no reasonable factual or legal support for the Respondents' "potential conflict" position.

Accordingly, the court finds that the Respondents' arguments are not well-taken and that the Objections should be overruled. The court approves and adopts the Report and Recommendation as its opinion.

THEREFORE, it is hereby ORDERED that

(1) Respondents' Objections to the Report and Recommendation of the United States Magistrate Judge are OVERRULED;

(2) the Report and Recommendation (docket entry 26) is APPROVED and ADOPTED as the opinion of this court;

(3) the instant petition for a writ of *habeas corpus* is GRANTED conditionally;

(4) the conviction of Billy McCamey for possession of precursors is VACATED;

(5) the State of Mississippi must commence a new trial of the Petitioner within 120 days of the date of this final judgment; and

(6) under Rule 23(c) of the Federal Rules of Appellate Procedure the court must determine whether McCamey's release, either on bond or personal recognizance is appropriate; the matter is REFERRED to the Magistrate Judge for further determination regarding release.

## REPORT AND RECOMMENDATION

JERRY A. DAVIS, United States Magistrate Judge.

Billy McCamey and Charles Hodnett were arrested around in the early morning hours on July 6, 2002, in the parking lot of the Columbus, Mississippi, Wal–Mart and charged with possession of methamphetamine precursors knowing that they were to be used to unlawfully manufacture the drug. Billy McCamey was convicted on that charge in a second trial in the Circuit Court of Lowndes County, Mississippi. He was represented by Donna Smith, a public defender. His first trial had ended in a mistrial when the jury was unable to reach a verdict. (See Exhibit G to petition, Smith affidavit).

The second trial was held on December 8th and 9th, 2003. During voir dire the trial judge asked if any of the jurors knew Smith. One of the potential jurors, Martha Hinton, made no response to this question. Hinton had not only made a professional negligence claim against Smith, when Smith missed a statute of limitations in a personal injury action, but she had also filed a bar complaint against Smith in Alabama which resulted in an informal admonition.

After the verdict Smith requested a poll of the jury. When Smith heard the name Martha Hinton called, she recognized the name of her former, disgruntled client. Smith claims that prior to that time she was unaware of Hinton's identity and presence on the venire and later on the jury

panel. Smith advised the district attorney of the situation. Both went to the presiding judge to report what had happened. The trial judge became very angry and threw Smith out of his chambers, refusing to listen to her attempted explanation. He accused Smith of deliberately allowing Hinton to sit on the jury. Smith now says her former client's physical appearance had changed dramatically.

Within a matter of minutes of this chambers conference the judge went back into court and sentenced McCamey to thirty-three years in prison. The statutory maximum for possession of precursors under § 41–29–313 Miss.Code Ann. is 30 years. Because McCamey had a prior drug conviction his maximum sentence could be doubled up to 60 years.[1]

Two days later on December 11, 2003, the judge called McCamey back to the courtroom and advised him about the "'problem with the juror.'" He asked McCamey if he wanted a new attorney. There was an exchange between McCamey and the trial judge during what the parties have referred to as a "waiver hearing." The trial judge recessed the proceedings with instructions that McCamey was to be held at the courthouse until he had reached a decision. At some point during that day, Smith had two other lawyers confer with McCamey. After this recess, McCamey indicated that he did not want Smith replaced as his attorney, and he wished to waive his right to raise the "juror issue" and a possible claim for ineffective assistance of counsel. That same day, on the judge's order, his attorney prepared an affidavit waiving McCamey's rights and had McCamey execute the affidavit.

On December 15, 2003, McCamey prepared and signed a motion for a new trial

protesting that the waiver was the result of manipulation by his trial counsel. The trial judge denied the motion for a new trial.

With new counsel representing him, McCamey appealed his conviction asserting that he had been denied a fair trial before an impartial jury and that he had not made a valid and knowing waiver of his rights. He also asserted that his Sixth Amendment right to be represented by conflict-free counsel had been violated and that he had not waived his right to conflict-free counsel. The Mississippi Court of Appeals affirmed the conviction and sentence. Its opinion effectively conceded that McCamey had been denied a fair trial by an impartial jury by the presence of his trial attorney's former client on the jury. The Mississippi court, however, found that McCamey had made a valid waiver of his constitutional rights. That court, without any discussion or explanation, found McCamey had also waived his right to conflict-free counsel. The Mississippi Supreme Court denied certiorari and rebuffed McCamey's application for leave to file for post-conviction relief.

In his petition for writ of habeas corpus in this court McCamey asserts two grounds. McCamey argues that the decision of the Mississippi Court of Appeals that he waived his right to a fair trial by a panel of impartial jurors is contrary to clearly established federal law. He also urges this court to find that the Mississippi court's holding that he waived his right to be represented by conflict free counsel is contrary to clearly established federal law as determined by the Supreme Court of the United States of America.

## I. *LIMITATIONS ON REVIEW*

Because McCamey has fully complied with all procedural requirements of Missis-

---

**1.** McCamey was convicted of conspiracy to distribute LSD in Clay County, Mississippi in 1993. He was sentenced to ten years on the offense.

sippi and federal habeas law, this court must consider both claims on the merits. This court's power to upset the judgments of the state courts in criminal matters is appropriately very limited. The federal courts address only issues affecting substantial federal constitutional rights. The federal courts do not function as super-appellate courts over the states and hold no supervisory authority over those courts. The federal courts may not correct errors of state law unless they also violate the constitutional rights of an accused.[2]

Even in matters affecting fundamental constitutional rights, the federal courts have a very limited scope of review. Title 28 U.S.C. § 2254(d) of the Anti–Terrorism and Effective Death Penalty Act (AEDPA) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Furthermore, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presump-

tion of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The bare-bones language of AEDPA gives limited guidance to the courts of the practical confines of the scope of review. The United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) construed the statute, explained its meaning and applied it to the facts in that case ultimately holding that the petitioner was entitled to relief. To truly understand the parameters of review under AEDPA, it is useful to not only review the Court's language construing the statute, but to look at its application of AEDPA to the facts in *Williams*.

While Terry Williams was incarcerated on another charge, he wrote an anonymous letter to law enforcement confessing to a murder. Law enforcement had previously attributed the victim's death to alcohol poisoning, not even recognizing it as a homicide. The letter also referenced an attack on an elderly woman. That attack had left the victim in a vegetative state from which she was not expected to recover. Williams did not sign the letter but was quickly identified as its author. On questioning he quickly confessed. When his victim had refused to loan him a couple of dollars, he had killed him with a mattock[3] and had taken his wallet. He had left his victim still alive and gasping for breath. He was convicted of robbery and capital murder.

At the sentencing hearing the state presented evidence of three earlier convictions for armed robbery, burglary and grand larceny. The state also presented his confession to the murder. Other aggravating factors included evidence of two earlier

---

**2.** *Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982); *Engle v. Isaac*, 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, n. 21, 71 L.Ed.2d 783 (1982); *Gilmore v. Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (O'Connor, J. Concurring) ("Mere error of state law, one that does not

rise to the level of a constitutional violation, may not be corrected on federal habeas."). *Id.* at 348–9, 113 S.Ct. at 2121.

**3.** A mattock is a hand tool similar to a pick axe with a broad chisel perpendicular to the handle.

offenses and two additional violent attacks on elderly victims. The jury was also advised that Williams had started a fire outside the home of one of his elderly victims. Additionally, Williams had been convicted of committing arson in jail while awaiting his trial. Two experts employed by the state opined that there was a high probability that Williams would in the future remain a serious threat to society.

Williams' attorney offered testimony from his mother and two neighbors, one of whom was asked to testify only at the hearing. These witnesses testified that Williams had been a nice boy and was not a violent person. There was a taped excerpt from a psychiatrist's statement that Williams had reported taking bullets out of his gun during an earlier robbery in order to avoid hurting anyone. Williams' attorney urged the jury to consider that Williams had turned himself in and had cooperated with law enforcement. The primary emphasis of his attorney's argument was, however, that it was "difficult to find a reason why the jury should spare Williams' life." *Id.* at 369, 120 S.Ct. 1495.[4] The jury found a probability of future dangerousness and imposed the death penalty. The trial judge concurred that the punishment was "proper and just."

Williams filed for postconviction relief in the state court. The same trial judge held an evidentiary hearing on Williams' claim that he had received ineffective assistance of counsel. The postconviction record produced documents from a commitment when Williams was 11 years old that described severe abuse and neglect as a young child. Williams was borderline mentally retarded and had received multiple head injuries severe enough to indicate an organic basis for his mental problems. The same two experts who testified at his sentencing hearing to Williams' future dangerousness were willing to testify that they believed that Williams could be safely committed to a prison environment.

The state court trial judge upheld the validity of Williams' conviction but held that the failure of his trial counsel to discover and put on this mitigating evidence was not professionally reasonable assistance of counsel. He found there was a reasonable probability that the result of the sentencing phase would have been different with competent presentation of the mitigating evidence. The trial judge, therefore, recommended to the Virginia Supreme Court that Williams be granted a new sentencing hearing.

The Virginia Supreme Court rejected this recommendation. That court assumed trial counsel's performance was deficient but disagreed that Williams had been prejudiced. That court, relying on *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993),[5] found that the trial

---

**4.** "I will admit too it is very difficult to ask you to show mercy to a man who maybe has not shown much mercy himself. I doubt very seriously that he thought much about mercy when he was in Mr. Stone's bedroom that night with him. I doubt very seriously that he had mercy very highly on his mind when he was walking down West Green and the incident with Alberta Stroud. I doubt very seriously that had mercy on his mind when you took two cars that didn't belong to him. Admittedly it is very difficult to get up and ask that you give this man mercy when he has shown so little of it himself. But I would ask that you would." *Id.*, n. 2.

**5.** In *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.1985), the Eighth Circuit had held that a death sentence was unconstitutional if based on an aggravating factor that duplicates an element of the underlying felony. *Collins* was the applicable law when Fretwell was tried for capital murder. During Fretwell's sentencing hearing, the state argued that there were two aggravating factors, including that the murder was committed for pecuniary gain, thus duplicating an element of the underlying felony of robbery. Fretwell's attorney failed to object. Following the United States Supreme Court opinion in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98

judge had erred in relying on "mere outcome determination" in making a determination of prejudice. *Williams*, 529 U.S. at 371, 120 S.Ct. at 1501. The state court also construed the trial judge's opinion as holding that the existence of omitted mitigating evidence would *per se* establish prejudice. *Id.* The Virginia court emphasized the evidence of future dangerousness, Williams' criminal history and his multiple recent offenses. That court characterized the mitigating evidence as "mostly relatives" who testified that Williams was nonviolent and could cope well in a structured environment. Comparing the evidence in mitigation against his criminal record, the court determined that this evidence "barely would have altered the profile of this defendant that was presented to the jury." *Id.* at 372, 120 S.Ct. 1495. The court held that Williams had failed to establish that he was prejudiced.

The federal habeas judge noted that the Virginia Supreme Court had failed to address the question of whether trial counsel's performance at the sentencing hearing fell below the range of competence demanded of lawyers in criminal cases. This judge in analyzing the record found five categories of mitigating evidence that the defense attorney had failed to introduce. He rejected an argument that the failure to conduct a more thorough investigation had been a strategic decision. *Id.* at 374, 120 S.Ct. 1495.[6] The federal trial judge found that the failure to investigate could not be justified as a matter of tactics. To the extent the trial counsel made a tactical decision to rely on the fact that Williams had turned himself in and confessed, the decision was not professionally reasonable. The federal district judge agreed with the state trial court judge that Williams had been prejudiced by ineffective assistance of counsel at the sentencing hearing. He held the Virginia Supreme Court had erroneously determined that *Lockhart*, 506 U.S. 364, 113 S.Ct. 838, had modified the *Strickland* standard.[7] Applying the AEDPA standard, this judge found that the Virginia Supreme Court's decision was "contrary to or involved an unreasonable application of clearly established federal law." He agreed with the state trial judge that the sentence needed to be set aside and a new sentencing hearing conducted.

L.Ed.2d 568 (1988), the Eighth Circuit reversed *Collins* in *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.1989). Fretwell sought release on federal habeas because of the failure of his attorney to make the *Collins* objection, even though *Collins* had by that time been overruled. The issue in *Fretwell*, as framed by the U.S. Supreme Court was "whether counsel's failure to make an objection in a state criminal sentencing proceeding—an objection that would have been supported by a decision which was subsequently overruled—constitutes 'prejudice' within the meaning" of *Strickland*." *Id.* at 366, 113 S.Ct. 838. The Court found that Fretwell had not shown *Strickland* prejudice. "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence only because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart*, 506 U.S. at 369–70, 113 S.Ct. 838.

6. In addition to the background evidence indicated above, there were correctional officers who were willing to testify that Williams would not pose a danger while incarcerated. Williams had also received commendations for assisting in breaking up a prison drug ring and for returning a guard's missing wallet. The favorable testimony of a respected local certified public accountant had not been presented at the sentencing hearing because of the failure of defense counsel to return this man's call offering assistance.

7. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The Fourth Circuit Court of Appeals reversed the federal district court and concurred with the Virginia Supreme Court. It characterized the evidence of Williams' future dangerousness as "simply overwhelming." It found Virginia's interpretation of *Strickland* and *Lockhart* were not unreasonable. The Court of Appeals held that the federal habeas relief could not be granted unless the state court "decided the question by interpreting or applying the relevant precedents in a manner that reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 374, 120 S.Ct. 1495.

In construing the statutory basis for review, the Supreme Court stated that independent meaning must be given to both the "contrary to" and "unreasonable application" clauses of the statute.

Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state court decision was either (1) "*contrary to* ... clearly established federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application* of clearly established federal law as determined by the Supreme Court of the United States."

*Id.* at 404–405, 120 S.Ct. 1495 (emphasis in the original).

Applying a Webster's dictionary definition, the word contrary "is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Id.* at 405, 120 S.Ct. 1495. Thus, "[t]he text of § 2254(d)(1) ... suggests that the state court's decision must be substantially different from the relevant precedent of this Court." *Id.* at 405, 120 S.Ct. 1495. "A state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth" in United States Supreme Court cases. *Id.*

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within the provisions of the "contrary to" clause.

*Id.* at 406, 120 S.Ct. 1495.

In the usual case, where the state court identifies and applies the correct legal principle(s) to the facts of the case, it is not "contrary to" established federal law even if a federal court would apply federal law differently. *Id.* at 406, 120 S.Ct. 1495.

The second circumstance under which federal habeas relief is appropriate is when "a state court decision ... correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08, 120 S.Ct. 1495. "[W]hen a state-court decision unreasonably applies the law of this Court to the facts of the prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court's decision falls within the provisions of the 'unreasonable application' clause." *Id.* at 409, 120 S.Ct. 1495. In defining what constitutes an unreasonable application the Court rejected the Fourth Circuit's "all reasonable jurists" formulation. The court must determine if the application is objectively unreasonable, not whether "at least one of the Nation's jurists" has applied the law in the same way. *Id.* at 410, 120 S.Ct. 1495.

But the Court further went on to say that an "unreasonable application of feder-

al law is different from an incorrect application." *Id.* at 409, 120 S.Ct. 1495.

> Congress specifically used the word 'unreasonable,' and not a term like 'erroneous' or 'incorrect.' Under § 2254(d)(1)'s 'unreasonable application' clause then, a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

*Id.* at 411, 120 S.Ct. 1495.

Notwithstanding this seemingly insurmountable standard of review, the United States Supreme Court found that the Virginia court's decision was both contrary to established federal law and an unreasonable application of its law. The Virginia Supreme Court erroneously interpreted *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), as imposing an additional requirement of fundamental unfairness over and above the *Strickland* requirement of showing prejudice. Thus, the state supreme court applied the wrong law to the case.

The Court also found the state court's analysis of prejudice to be unreasonable. While admitting that some of the pretermitted evidence was unfavorable because showing extensive criminal misconduct as a juvenile, the Court found the state court's analysis was unreasonable "insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Id.*

at 397, 113 S.Ct. 838 (citation omitted). By failing to consider as a factor the one argument made by Williams' counsel at his sentencing hearing, in tandem with the habeas evidence, the state-court decision was unreasonable. Even adding up Williams' horrific childhood, his borderline mental retardation, his act of turning himself in for several crimes, his expressed remorse and his cooperation with authorities, the Court conceded, "the finding of future dangerousness" might remain unchanged. Nevertheless, the evidence *"might* well have influenced the jury's appraisal of his moral culpability." *Id.* at 398, 113 S.Ct. 838 (Emphasis added). The Court noted "the circumstances recited in his several confessions are consistent with the view that in each case his violent behavior was impulsive rather than the product of cold-blooded premeditation." *Id.* at 398, 113 S.Ct. 838.[8] The Court further noted "mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death eligibility case." The Virginia Supreme Court did not entertain that possibility. *"It thus failed to accord appropriate weight to the body of mitigation evidence* available trial counsel." *Id.* at 398, 113 S.Ct. 838. (Emphasis added).

Reading solely the language of the standards to be applied leaves one with the impression that the scope of review is so impossibly narrow as to render the filing of virtually every federal habeas petition an act of futility. No doubt the standards for the grant of habeas relief in federal

---

8. The undersigned notes Williams' confession could be interpreted to the contrary. According to the confession Williams was provoked because his victim refused to loan him a few dollars. He then decided to kill his victim. He went into the kitchen and looked at available knives but decided against using those items. He then left the kitchen, going to the bathroom in search of a weapon and selected the mattock. He hit his victim in the chest and back before replacing the weapon in the bathroom. He left his victim alive, helpless and gasping for breath. Substantially less time, preparation and planning are routinely held to prove premeditation.

court for state court convictions are high, very demanding and rarely met, but seeing the Court's application of the standards tempers the language a little, as does understanding that the Court rejected the "no reasonable jurists" formulation. An application of federal law to the facts of the case may be unreasonable notwithstanding dispute regarding its correctness among jurists. Indeed in *Williams* the presumably reasonable jurists of Virginia Supreme Court and of the Fourth Circuit Court of Appeals believed they were correctly applying the law to the facts. Three Supreme Court justices also thought that their application of the law to the facts was correct and that habeas relief should have been denied. Reasonable jurists may well debate whether these courts and these judges were "right," "merely wrong" or "unreasonably wrong."

In looking at how the Court applied the AEDPA standard to the facts of *Williams,* one is struck by the understanding that an extraordinarily high standard of deference is due to the state courts but that an "unreasonably wrong application" of the federal law is something short of the indisputably and inarguably wrong. The standard that seems impossibly high by its language proves on closer analysis to be a more amorphous and ambiguous in its application. Even for a profession schooled in and accustomed to ambiguity, with multiple undefinable, but never the less well understood standards,[9] the determination of the difference between a "wrong" application of the law and "unreasonably wrong" application of the law veers toward

a judicial attempt at nailing Jell-O to a wall.[10]

This petitioner's claims have been examined in light of the standards of review set out by the AEDPA and as construed in *Williams.*

## II. *STATE COURT RECORD*

On direct appeal the state court had before it the record of the voir dire examination by the court. This part of the record demonstrated that Martha Hinton withheld material information during voir dire which would have established grounds for challenging her for cause. During the court's voir dire, the venire panel was specifically asked by the trial judge whether they knew Smith or any member of her immediate family. Several members of the venire panel responded to the question. Some indicated that they or their family members had been represented in the past by Smith. They were questioned by the judge regarding the impact of Smith's representation on their ability to be fair in the case. R. 14–17. Hinton could not have failed to recognize the relevance of her knowledge of Smith, but in particular the relevance of their unhappy past professional association. The judge at two different points during the voir dire asked the panel whether he had overlooked anyone. Hinton failed to respond. (R. 17).

The record on direct appeal to the Mississippi Court of Appeals showed only that it had become known at some point after the trial that Smith had previously repre-

---

**9.** The law's "reasonable person" standards being one obvious example

**10.** Without question Congress wanted to increase the respect and deference afforded to state court determinations by federal courts on matters of federal constitutional law as applied in criminal cases. It is unfortunate that the standard when relief must be grant-

ed, is needlessly insulting to the state judiciary. It does not serve the cause of comity, nor does it reduce friction between the state and federal judiciaries when federal court judges are not allowed to disagree with their state court colleagues without seeming disagreeable or disrespectful. The responsibility for this unintended consequence of AEDPA lies with Congress not the courts.

sented Hinton and the history of the representation. The record also showed that between the sentencing and the waiver hearing, Smith filed a motion for new trial which made no mention of the problem with Hinton and did not raise McCamey's right to fair trial before an impartial jury.

Also in the state court record was the transcript of the hearing two days after McCamey's sentencing when the trial judge addressed the problem with Hinton and obtained the purported waivers by McCamey. The colloquy between the judge and McCamey is discussed elsewhere in additional detail, but in essence the trial judge offered to appoint new counsel for McCamey. The trial judge did not advise McCamey of his right to a fair trial before an impartial jury nor that Hinton's presence on the jury deprived him of his right to a fair trial before an impartial jury. He asked McCamey if he would like to retain a Donna Smith as his attorney. He advised McCamey that he 'might have' or 'could have' a ground for new trial based on Hinton's presence on the jury. He suggested at one point that McCamey might have a claim for ineffective assistance of counsel against Smith. When asked by McCamey why he should want a new attorney, the trial judge said that that would be something that a new attorney would have to address with McCamey. He recessed the hearing briefly to allow McCamey to confer with Smith. Smith had two other criminal defense attorneys confer with McCamey.

On the reconvening of the hearing McCamey indicated that he wished to retain Donna Smith as his attorney advising the court that he believed she had done a good job for him. McCamey further took the step of defending his attorney by advising the court that she had already advised McCamey of the problem with the juror prior to the hearing. The judge told McCamey that because he wanted to retain Smith as his attorney, he had to waive the juror issue and the possible ineffective assistance of counsel claim. After McCamey had indicated he desired to retain Smith and after he had already indicated that he would waive his rights, the court, then and only then, advised him that he would also be waiving these issues for the purposes of postconviction relief. Under normal circumstances Mississippi law provides that claims for ineffective assistance of counsel are preserved and may be presented for the first time on motion for postconviction relief where trial counsel serves as appellate counsel, *Wiley v. State*, 517 So.2d 1373, 1378 (Miss.1987). The usual practice in Mississippi, because of the limited record on direct appeal is to deny any claim for ineffective assistance of counsel on direct appeal, without prejudice, even if new counsel is representing the defendant and to defer consideration until a postconviction claim is made. *Archer v. State*, 986 So.2d 951 (Miss.2008) ("Ordinarily ineffective-assistance-of-counsel claims more appropriately brought during post-conviction proceedings. This is because during direct appeals the Court is limited to the trial court record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately." *Id.* at 955). Claims may be presented on direct appeal only where "such issues are based on facts fully apparent from the record." M.R.A.P. 22(b).

The judge directed Smith to prepare an affidavit for McCamey's signature waiving his rights.[11] This affidavit refers to waiv-

11. McCamey's affidavit provides in pertinent part: "Both my attorney, Donna S. Smith, and the Court have informed me that a juror was seated on my case who did not respond to the Court's question regarding whether she knew Ms. Smith or anyone in Ms. Smith's family. I know that the juror, Martha D. Hinton, had previously sued my attorney and obtained an informal admonition directed to Ms. Smith by the Alabama State Bar. Since

ing the issue of the juror but never refers to McCamey's right to be tried by a fair and impartial jury. The judge also directed Smith to prepare an amended motion for new trial including the issue of Hinton's presence on the jury. There is nothing in the state court record about any advice to McCamey about any conflict of interest, nor any proof or indication of any waiver by McCamey of his right to conflict-free counsel.

On his motion for postconviction relief McCamey submitted affidavits from Donna Smith, Michael Farrow, himself, and his mother. Smith's affidavit details that she was called to trial at the last minute and did not obtain a copy of the "venire as seated" list until immediately prior to the commencement of the trial. During voir dire she had no "other identifying data such as race, sex and age as the voir dire proceeded." She e made notes as the voir dire proceeded. She obviously did not review the juror information cards or the names of the potential jurors. According to the affidavit she was not paying attention when the jury panel was called, impaneled and sworn. She realized only as the jury was being polled after McCamey's conviction that a Martha Hinton was on the jury. The affidavit details what happened during her representation of Hinton. Smith attributed her failure to recognize Hinton on sight to changes in her former client's appearance.

When she heard the name, Smith pulled and reviewed Hinton's juror information card and verified that Hinton was indeed her former client. Smith sought out the district attorney and went with him into the trial judge's chambers. "I advised him of the problem with Ms. Hinton being on the jury. [The judge] was, to say the least, incensed and baldly stated that I had sandbagged the Court. He would not listen to any explanation and told me to leave his chambers, which I did."

According to this affidavit Smith then discussed the problem with Billy McCamey. The affidavit states McCamey was understandably upset as was Smith. "He asked me many questions about what would happen since this had occurred. I explained that he had a right to a new trial based on the fact that he did not receive a fair and impartial jury, as well as a possible ineffective assistance of counsel claim. *McCamey then asked what would happen to me if he exercised his right to a new trial. I told McCamey that I could lose my position as a public defender given [the judge's] then existing wrath at me* ...." R. Briefs & Other Pleadings, Ex. C to Petition for Post–Conviction Relief. (Emphasis added.) She claims that she did tell McCamey that she did not care if she lost her position and that his life was too important to throw away for the next 33 years. McCamey told her that he did not want to get her in any trouble. She reported that she again told him not to base his decision on consequences to her. When McCamey again insisted that he wanted to waive his rights because of the

being made aware of these developments, I have been independently advised by Attorney Michael R. Farrow and Attorney Carrie A. Jourdan and, as well as by Ms. Smith and the Court, that this could result in a new trial being granted and, further, that her selection as the juror could be raised as an issue on appeal of my conviction and for Post–Conviction relief. I understand that I have the right to raise this issue, as well as ineffective assistance of counsel, on appeal and in any peti-

tion I may choose to file for Post–Conviction relief. Having been advised of all this I hereby waive the issue of the juror having been selected to sit on my jury trial who failed to respond to the voir dire by the court and who had been involved in previous litigation involving my attorney, Donna S. Smith. I further waive the issue of ineffective assistance of counsel arising from the selection of the juror Martha D. Hinton." It was dated on December 11, 2003.

possible consequences to her, she had two other members of the defense bar counsel with him. After the trial judge reconvened McCamey's case and McCamey again stated his desire to waive his rights, Smith stated that she prepared the affidavit and McCamey signed it against her ongoing advice not to waive his rights.

According to McCamey's affidavit, Smith was not only worried about the possibility of losing her job but also the possibility of being disbarred if he pursued his rights. McCamey said that if it had been explained to him that Mississippi law would mandate that he get a new trial because of the "juror issue," he would've set aside his feelings for his attorney and not allowed her to influence his decision. He would have in fact accepted the offer of appointment of new counsel made by the trial judge.

### III. STATE COURT DECISION

In his appeal to the Mississippi Court of Appeals McCamey raised four issues pertinent to this case. First, McCamey asserted that his Sixth Amendment right to a fair and impartial jury and his Fourteenth Amendment right to fair trial were violated when the trial judge allowed McCamey's conviction to stand once he became aware that the jury selected to try McCamey was not impartial. McCamey also asserted that he did not make a valid waiver of his Sixth Amendment right to trial by an impartial jury. McCamey asserted that his Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated when the trial judge allowed him to be represented by his attorney after it became apparent that an actual conflict of interest existed between the attorney and McCamey. McCamey asserted that he did not make a valid waiver of his Sixth and Fourteenth Amendment rights to be represented by conflict-free counsel. The Mississippi Court of Appeals opted to treat these four issues as one.

Under state law the review of a claim of juror bias is limited. "[J]uror impartiality and fairness is a judicial question to be determined on a case-by-case basis, the court's judgment will not be disturbed unless clearly wrong." *Dennis v. State*, 555 So.2d 679, 682 (Miss.1989) (citing *Walls v. State*, 371 So.2d 411, 413 (Miss.1979)); *Odom v. State*, 355 So.2d 1381, 1383 (Miss. 1978))(quote from *McCamey v. State*, 923 So.2d 223, 227 (Miss.Ct.App.2005)). The Mississippi court did not disagree with McCamey that Hinton's presence on the jury denied him an impartial jury. That court noted that a juror is disqualified, "when during voir dire examination, he or she has misrepresented material facts." *McCamey*, 923 So.2d at 228. The failure to respond requires a new trial if "the question was (1) relevant to the voir dire examination, (2) unambiguous, (3) the juror had substantial knowledge of the information sought to be elicited, and (4) prejudice in selecting the jury could be reasonably inferred from the juror's failure to respond." *Id.*, citing *Odom*, 355 So.2d at 1383. The court then went on to hold that Hinton should have been disqualified. As the Mississippi the court noted the question about whether a juror knew Smith was relevant and unambiguous. Hinton indisputably had the knowledge of information being sought and "as such Hinton should not have been allowed to participate as a juror." *Id.*

The Mississippi Court of Appeals recited the on-the-record conferences between McCamey and the judge and concluded that McCamey had knowingly and intelligently waived his fair trial rights. The Mississippi Court of Appeals had little to say about his third and fourth issues relating to the purported actual conflict of interest between McCamey and his counsel. The court initially mentioned these two issues but then without any further discussion held

As the record clearly reflects, McCamey was well aware of the rights which he was waiving. McCamey has failed to demonstrate that the waiver was made with a lack of knowledge or understanding of the consequences. *As such, McCamey has knowingly and intelligently waived each of the four sub issues he raises on appeal and therefore McCamey's contentions are without merit.*

*McCamey*, 923 So.2d at 230 (Emphasis added).

There is no discussion about whether Smith had a conflict of interest. There is no reference to any on the record waiver specific to this right to be represented by conflict-free counsel. It is this court's job to determine if these holdings are either contrary to or an unreasonable application of federal constitutional law as enunciated by the United States Supreme Court.

## IV. *GRANT OF EVIDENTIARY HEARING*

The undersigned granted the petitioner's motion for an evidentiary hearing over the objection of the respondents. The respondents have argued that McCamey was not entitled to the hearing and that this court lacked the authority to grant a hearing because there is no showing that the limited exceptions of 28 U.S.C. § 2254(e)(2) are applicable to McCamey's case. The respondents have taken the position in this case and other cases that this court cannot hold evidentiary hearings unless these limited conditions are present. They seemingly miss the qualifier at the beginning of this section, "If the applicant has failed to develop the factual basis of the claim ..." The necessity for meeting the exceptions of this statutory provision only apply when the failure to develop the factual basis for the claim is attributable to some decision or omission of the petitioner. *Williams v. Taylor*, 529 U.S. 420, 432, 120 S.Ct. 1479, 1488, 146 L.Ed.2d 435 (2000);

*Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000).

The failure to have the record fully developed cannot be charged to the petitioner as he sought, but was denied an evidentiary hearing, on his motion for postconviction relief. Additionally the duty to develop the record at the "waiver hearing" to show a knowing and intelligent waiver of McCamey's rights would necessarily have had to fall upon the trial judge and/or the prosecuting attorney. *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Nor can McCamey be charged with any failure to develop a record on the conflict of interest. For reasons hereafter discussed the undersigned finds that the trial judge was at least partially responsible for developing this matter for the record. McCamey for his part could not be expected to appreciate or make the record on his attorney's conflict of interest or be charged with her omission to make a record of the conflict.

Once it is determined that the provisions of § 28 U.S.C. § 2254(e) do not prohibit the granting of an evidentiary hearing, the request is addressed to the discretion of the court. McCamey submitted affidavits which supported his claims. (Ex. G, H, I to the petition). Given the incompleteness of the state-court record, the apparent denial of a fair and impartial jury, the possibility of conflicts of interest by McCamey's counsel and the fact that his waiver brought McCamey absolutely no concessions, benefits or perceived benefits, the undersigned exercised his discretion to grant the hearing.

Also supporting the decision to grant the evidentiary hearing is the fact that observing McCamey gives an understanding of his intelligence, education and other factors that bear upon whether he knowingly and intelligently waived his rights. This information was known to and observed by

the trial court but would not be captured on the record.

## A. *THE EVIDENTIARY HEARING*

At the evidentiary hearing the first witness called was Donna Smith. Smith as of the date of the hearing remained a public defender in Columbus, Mississippi. She testified the trial that is the subject of this habeas petition was in fact McCamey's second trial on these charges. The first trial resulted in a mistrial when the jury was unable to reach a verdict. She reiterated what was stated in her affidavit-that she became aware of Hinton's presence on the jury only when the jury was polled after the verdict. After confirming that Hinton was indeed her client, according to Smith's testimony:

> I immediately found the DA, explained to him what had happened and we went back into chambers and sat down with [the judge]. I tried to explain to [the judge] what had happened. He was ... became quite angry, refused to listen to any further explanation from me. *Told me to get the hell out of his chambers.* (Emphasis added).

She testified that he was quite angry and accused her of sandbagging the court. She said that this particular trial judge can be quite intimidating at times. When asked if the trial judge was livid with her, Smith responded: "He was indeed." Asked her feelings after being thrown out of the judge's chambers, Smith replied:

> To use your words, I was intimidated. I was upset. I knew Mr. McCamey's life was on the line. His liberty was on the line. Uhm ... we went almost immediately into sentencing and quite frankly, Judge, I cried all the way through sentencing. I was so upset and had been so intimidated by [the judge].

She estimated the time between being thrown out the judge's chambers and the sentencing at 15 to 20 minutes.

She testified that she talked to McCamey about what had happened only after the judge had, in her words, "banished me from his chambers." McCamey asked her what would happen to her if he exercised his rights. She told him given the trial judge's "wrath with her" that he could fire her as a public defender. She claims that she told McCamey that she didn't care.

She testified that she had filed the original motion for new trial based only on insufficient evidence on November 11, 2003. She later filed an amended motion for new trial including the 'juror issue' but never argued it before the judge. The trial judge later instructed her to submit an order denying the motion.

When asked if she had ever made an argument to the judge about the lack of an impartial jury, Smith said that prior to the waiver hearing, "I was not allowed to speak with [the judge] about this case. Whether or not the DA was present. I was still under banishment, if you would."

Smith also testified to what happened during the waiver hearing. She mentioned that McCamey asked the judge why he would want new counsel. The judge's response was that a new attorney would have to explain that to him. She was then asked "so [the judge] would or would not tell him why he needed to have a new attorney?" Smith responded, "In my opinion, would not. And I think the transcript supports that." She said that when asked if he wanted to stick with her, McCamey indicated that he did and voiced his opinion that Smith had done a fine job for him.

Smith testified to the heavy criminal trial docket in Lowndes County. She estimated that at the time of McCamey's trial there would be approximately 300 new indictments each of the four jury terms per year. She estimated that the judges would each have 20 to 30 cases on the docket every day during each of the terms.

She said that the trial judge would certainly not have been happy to have been faced with the prospect of a third trial for McCamey on the same charge.

When asked about the demeanor and atmosphere in the court room, Smith testified,

Basically I felt it was a CYA hearing, since during that hearing Mr. McCamey orally waived his rights. [The trial judge] from the timbre of his voice what happened was [the trial judge] told me to prepare that order[affidavit] and without saying so in so many words told Mr. McCamey to sign it. He was ... I don't want to say he was strident, but quite strong in his suggestion that that would happen.

Smith claimed to have told McCamey that he had a right to a new trial. When asked if the trial judge had ever told McCamey that he had a right to a new trial Smith responded, "No, he hem-hawed all around it." When asked whether she believed that if Mr. McCamey had intelligently waived his right to a fair jury Smith responded,

*I think Billy waived his right out of a misplaced concern for what might occur to me.* I kept telling him do not make your decision based upon those concerns. I do not care what happens to me. You're looking at 33 years. You need to make your decision based on what happened in that courtroom. (Emphasis added).

Smith was also asked:

Assuming that all we are looking for are his best interests ... what Mr. McCamey's best interest is, was there any rational, any reason not to file a motion for new trial based on lack of an impartial jury and to argue such a motion to the court, assuming you are just acting in Mr. McCamey's best interest?

Smith replied, "No."

On cross examination by the state when asked what McCamey's initial reaction had been when she tried to explain what happened with the juror, Smith testified:

Actually I don't think he understood exactly what I was telling him. And I went back ... or should I say stopped and tried to explain it more thoroughly to him. I also at that point realized he's in jeopardy of giving up some rights he needs to assert and went and asked Mr. Farrow, Michael Farrow and Ms. Carrie Jourdan, who are members of the defense bar to talk to him to basically make sure he understood what was going on from someone other than me.

Smith was asked if she let her personal feelings about her job influence her advice to her client. Smith replied that she did not let those feelings influence her advice to her client.

During her redirect examination Smith admitted that McCamey appeared to be acting irrationally at that point because he getting nothing in exchange for his waiver. She admitted she could have protected his rights by announcing to the court that he would not waive his rights to an impartial jury. When asked why she didn't do that Smith initially replied, "Actually the reason I didn't do it was because Mr. McCamey was under oath in the courtroom when he was making those statements himself."

When pressed about whether she could have simply announced to the court that he would not waive his rights given the lack of a rational basis for his decision to do so, Smith admitted that she could have. She was asked "And you would have done that, would have done that if you had not been so intimidated by [the trial judge] wouldn't you?" Smith replied, "And had I not been so upset with what was going on, yes." Smith was again asked if McCamey made an irrational decision. She replied, "I would have to agree with that, yeah."

Billy McCamey also testified at the evidentiary hearing. His recollection is that the first indication he had of a problem with the juror was a few days after his sentencing. He said he didn't know why he was being called back to the courthouse. He testified that when he got back to the courthouse Smith told him about the problem with the juror. The undersigned accepts and credits McCamey's recollection of when he was first advised of the problem with Hinton. McCamey testified that he didn't really understand what Smith was saying about the consequences of the juror being on the jury. When asked about discussions with Smith about whether or not he should ask for alternate counsel, McCamey testified that Smith just asked him if he wanted to get another attorney and he told her no, that he thought she had done a good job for him. He didn't remember anything else being discussed about whether he should get another attorney. This conversation took place immediately prior to the waiver hearing on the day of the waiver hearing.

McCamey was asked if Smith had said anything to him about what might happen to her if he got another attorney and asked for a new trial. McCamey stated, "She said something about being as [the trial judge] was so mad that he could probably fire her." He also recalled her saying something about being disbarred. He said Smith was very upset. The judge never explained that if he got a new attorney he could get a new trial. McCamey testified that if it had been explained to him that way he would not have waived his rights. McCamey admitted he was very concerned about Smith's welfare and worried that she would lose her job. He believed that Smith had done a good job for him and he did not want to cause her any harm. McCamey testified at the hearing that he now understood that he had a right to new trial, had he not waived it. At the time of the waiver hearing he did not understand

that. McCamey did not understand that the meeting was not routine. He testified,

I thought it had something to do maybe if my attorney didn't represent me good or whatever. That's what I thought the whole thing was about. I thought [the trial judge] later on was going to give me a new trial on account of, he done said something about the juror. I was thinking that he was going to do that on his own, was what I thought.

When asked about the waiver itself, McCamey said, "The judge had asked me, and when he told me, he said that ... did I want a new attorney, and I said no. Well I want an affidavit drew up and I want you to sign it. And I told him okay." He was questioned about his understanding of the affidavit. He thought he was waiving his rights to claim ineffective assistance of counsel. "And as far as you could tell from what you observed about her performance, you thought she was a good lawyer?" McCamey responded, "Yes."

He recalled speaking with Mr. Farrow. He remembers Farrow asking him if he wanted a new attorney. McCamey told Farrow he believed Smith had done a good job for him. He also remembered the consultation with Jourdan. Jourdan, according to McCamey, did not appear to be certain about what was going on. She was telling him something about a juror who was on the jury who was not supposed to be there. She asked him if he wanted a new attorney. He told her he didn't want new attorney; that he wanted Ms. Smith.

McCamey testified that he didn't want to cause Smith any harm. He believed that she had done a good job for him in the trial of his case. He waived his rights and signed the affidavit because he thought the Donna Smith was the best attorney.

On questioning by the undersigned, McCamey testified that he had an 11th

grade education having gone through that grade several times. He claimed to be able to read and write. He had undergone treatment for mental disorders some 15 or more years prior to the hearing. He was unable to provide any information regarding diagnosis but was seen by psychiatrist and was institutionalized for a time as result of his mental troubles. He has also undergone treatment for drug addiction. It was apparent to the undersigned that McCamey is of below average intelligence with very limited education. McCamey's demeanor in the court room and dealing both with the undersigned and the attorneys showed a very respectful and deferential approach to authority figures that at least borders upon being obsequious. It was also apparent that while McCamey seeks relief he still has faith and confidence in his former trial counsel and a lingering loyalty to her. According to McCamey, the trial judge never advised him that he had a right to a new trial nor did he explain to him why he should get another attorney. The judge never mentioned anything about a conflict of interest.

The respondents called Michael Farrow. Like Smith he is a practicing attorney Columbus, Mississippi, and one of the public defenders in Lowndes County. He spoke with McCamey at Smith's request. He described it as a four or five minute conversation in the sheriff's office. Smith advised him of the problem with the juror. She asked Farrow to speak with McCamey about his appellate rights. He has no specific recollection of his conversation with McCamey but testified based upon what he believes he would have said. Farrow testified that his advice to McCamey would have been not to waive anything unless you're getting something for it. Otherwise a waiver of rights makes no sense. He could not say whether he had discussed anything about the likelihood or unlikelihood of being granted a new trial with McCamey. He testified he definitely would not have told McCamey that being granted a new trial was a certainty. He did not recall talking to McCamey about the consequences of waiver. He had no specific recollection of talking to McCamey about the ineffective assistance of counsel claim but assumed that he did so. Farrow said McCamey seem to be very concerned about keeping Ms. Smith as his attorney. He said based on his own experience in dealing with defendants that it is difficult to determine their mental status. He testified that he sometimes wonders if they are even listening to what their attorneys tell them. Most defendants have a very limited understanding of the judicial system and low IQs. He testified that he would place McCamey in that category.

Farrow did not believe that McCamey understood the ramifications of the situation. Farrow himself did not understand that McCamey would be losing the 'juror issue' for the purposes of appeal by doing the waiver at that time. Accordingly he did not advise McCamey of the impact of waivers on appeal or post-conviction.

## V. DEFINITION OF THE ISSUES AND STRUCTURE OF ANALYSIS

Initially, the undersigned finds that in undertaking an analysis of the record, it is advisable to state up front what issues are before the court and in so doing to refine those issues from those stated by the petitioner. In his petition McCamey states the issues as follows:

GROUND ONE. The Mississippi Court of Appeals decision holding that McCamey waived his right to a fair trial by a panel of impartial jurors is contrary to clearly established federal law as determined by the Supreme Court of the United States.

and

GROUND TWO. The Mississippi Court of Appeals decision holding that McCamey waived his right to be represented by conflict-free counsel is contrary to clearly established federal law as determined by the Supreme Court of the United States.

Implicit in each of these two grounds are additional questions which must be answered in order to determine whether McCamey is entitled to habeas relief. The undersigned finds that three of the four issues before the Mississippi Court of Appeals remain to be considered by this court. With regard to Ground One an implicit question is whether McCamey was deprived of a fair trial by a panel of impartial jurors. That question has been answered in the affirmative by the Mississippi's Court of Appeals.

To resolve Ground Two the court must determine several issues. First, the court must determine whether there was a conflict of interest between Smith and McCamey and its impact on his representation. The respondents have conceded that McCamey has not waived his right to conflict-free counsel, but the undersigned will briefly address this issue since the Mississippi Court of Appeals held that McCamey had waived this ground.

The petitioner also contends that the Mississippi Court of Appeals failed to issue a decision on the merits on Ground Two, the conflict of interest claim. McCamey, therefore, claims that the matter must be decided by this Court *de novo*. The respondents disagree, asserting that the matter has been resolved on the merits by the Mississippi Court of Appeals, and is, therefore, subject to the AEDPA's limited deferential standard of review.

The parties also disagree on the legal standard to be applied in evaluating the impact of any conflict of interest. The petitioner argues for the application of the more lenient presumed prejudice standard

articulated in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed2d 333 (1980). The respondents contend that pursuant to *Beets v. Scott*, 65 F.3d 1258 (5th Cir.1995) (en banc), that the petitioner's claim must be evaluated under the *Strickland* standard. The respondents assert that McCamey must show both deficient performance by his attorney and resulting prejudice, a burden which they contend McCamey cannot meet.

Finally, the issues of fair trial rights and conflicts of interest are not neatly separable. Conflicts of interests by counsel and ineffective assistance of counsel during the waiver hearing are potentially fatal to any waiver of McCamey's right to be tried by an impartial jury. Additionally the same part of the record, the colloquys between McCamey and the judge, are the crucial portion which must be analyzed in evaluating both issues.

Therefore, the analysis of the rest of the report and recommendation is structured as follows: 1) a discussion of the law pertinent to both grounds; 2) a general discussion of law pertinent to Ground One; 3) a general discussion of the law pertinent to Ground Two, and resolution of conflicts regarding applicable law; 4) detailed analysis of the waiver hearing exchanges between McCamey and the judge with regard to both Grounds One and Grounds Two; followed by additional analysis as to 5) Ground One separately and 6) Ground Two separately. The report and recommendation closes with some final comments and the undersigned's conclusions and recommendations.

## A. *LAW COMMON TO BOTH GROUNDS WAIVER OF CONSTITUTIONAL RIGHTS*

Both of McCamey's stated grounds revolve around whether there has been a valid waiver of his constitutional rights and

involve the application of the same case law. In *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the United States Supreme Court stated: "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.'" *Id.* The court further instructed: "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been intelligent waiver ... must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.*

■ In McCamey's case the rights involved are two of the most fundamental rights necessary to assure due process and fundamental fairness in trials—the right to be tried by an impartial decision-maker and the right to have effective assistance of counsel, more specifically in McCamey's case the right to be represented by conflict-free counsel. "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). The requirement that waivers must be knowing, intelligent acts applies not only to the right to counsel but other trial rights. *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019.

The United States Supreme Court made clear in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) why the presumption against waiver of vital constitutional rights was critical:

> A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to ensure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. *Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided.*

*Id.* at 241, 93 S.Ct. 2041 (Emphasis added).

The United States Supreme Court has further placed the responsibility for assuring that any waiver is knowingly and intelligently made squarely upon the shoulders of the trial judge.

> To discharge this duty (of assuring the intelligent nature of the waiver) properly in-light of the strong presumption against waiver of the constitutional right ..., a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right ... and desires to waive this right does not automatically end the judge's responsibility.

*Id.* at 244, n. 32, 93 S.Ct. 2041 (quoting from *Von Moltke v. Gillies*, 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 309, 320–21 (1948) (in the context of waiving the right to counsel the trial judge in order to attain a valid waiver was required to assure that the defendant understood the nature of the charges, the statutory offenses, the range of allowable punishments, possible defenses, circumstances in mitigation and "all other facts essential to a broad understanding of the whole matter.")).

■ Any waiver of these fundamental rights should appear upon the record. *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019, and "presuming waiver from a silent record is impermissible." *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962):

■ Also germane to the analysis of both issues is the responsibility of the trial judge to protect the rights of the criminally accused. The trial court has a duty particularly in connection with potential waivers of constitutional rights to act in a protective role to ensure that any waiver of rights is knowingly and intelligently made with a full understanding of the relevant circumstances. The United States Supreme Court has held that in connection with a waiver of the right to counsel "[t]he constitutional right of accused be represented by counsel invokes, of itself, the protection of the trial court, in which the accused-his life or liberty is at stake, is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge in determining whether there is an intelligent and competent waiver by the accused." *Zerbst*, 304 U.S. at 465, 58 S.Ct. 1019. This is so because "[t]he Constitution requires that every effort be made to see that a defendant in a criminal case has not unknowingly relinquished the basic protections that the framers thought indispensable to a fair trial." *Schneckloth v. Bustamonte*, 412 U.S. at 242, 93 S.Ct. 2041. The duty of trial judges to protect the fundamental rights of the accused is not limited to waiver scenarios. *MacKenna v. Ellis*, 280 F.2d 592, 600 (5th Cir.1960) ("Fundamental fairness to a person accused of crime requires such judicial guidance of the conduct of a trial that when it becomes apparent appointed counsel are not protecting the accused the trial judge should move in and protect him."). *United States v. Greig*, 967 F.2d 1018 (5th Cir.1992) ("While we recognize that a trial court does not always have an affirmative duty to inquire into the possibility of a conflict of interest, it does have a duty to conduct a hearing once it has been alerted and certainly when it knows of the existence of an actual conflict of interest." *Id.* at 1022). *Armstrong v. State*, 573 So.2d 1329, 1335 (Miss.

1990) ("As an actual conflict of interest which adversely affected counsel's performance was shown, the trial court reasonably should have known the conflict existed; failure of the trial court to so inform Armstrong constitutes a clear violation of the procedure prescribed in *U.S. v. Garcia*, 517 F.2d 272 (5th Cir.1975), for accepting a waiver of the right to conflict-free representation.").

In looking at whether a valid waiver has been knowingly and intelligently made, this court must necessarily assess the extent to which the trial judge adequately performed this constitutionally mandated protective function.

## B. *LAW ON GROUND ONE–FAIR TRIAL*

"[O]ur common-law heritage, our Constitution, and our experience in applying that Constitution have committed us irrevocably to the position that the criminal trial has one well-defined purpose-to provide a fair and reliable determination of guilt." *Estes v. Texas*, 381 U.S. 532, 565, 85 S.Ct. 1628, 1644, 14 L.Ed.2d 543 (1965) (Warren, C.J., with whom Douglass and Goldberg, JJ, joined, concurring). Central to assurance that criminal trials will be fair and reliable means of determining guilt is our determination that "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworn.' (Citation omitted). His verdict must be based upon the evidence developed at the trial. (Citations omit-

ted). This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.

*Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ As a matter of constitutional law the presence of one biased juror deprived McCamey of a fair and impartial jury. Every member of his panel must be fair, impartial and indifferent or he has been deprived of his right to an impartial jury. *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (Where only two of twelve jurors heard an improper comment by a bailiff, the defendant's right to an impartial jury was denied). It is beyond dispute Billy McCamey did not have a fair and impartial jury and without a fair impartial jury, he necessarily was deprived of a fair trial.

■ While the United States Supreme Court has continued to move toward more "harmless error" analysis in any number of cases involving fundamental constitutional error, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967),[12] the deprivations of a fair trial before an impartial jury is structural error, that undermines confidence in the reliability of the determination and is not subject to harmless error analysis. *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *Neder v. U.S.*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (Those cases, we have explained, contain a

"defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 8, 119 S.Ct. 1827, quoting from *Fulminante*, 499 U.S. at 310, 111 S.Ct. 1246).

The Mississippi Court is charged with applying the presumption against a valid waiver of fundamental constitutional rights and this court is charged with determining if the state court's determination that McCamey validly waived those rights is either contrary to, or an unreasonable application, of federal law as enunciated by the United States Supreme Court.

■ The undersigned nevertheless begins the analysis of this ground at a troubling and undisputed beginning point—Billy McCamey did not in fact receive a fair trial before an impartial jury. His conviction, and with it the accompanying sentence, beyond dispute rests upon the verdict of a biased jury. Thus in the absence of a valid waiver of fundamental constitutional rights, McCamey is entitled to habeas relief.

### C. *LAW ON GROUND TWO—CONFLICT OF INTEREST*

#### 1. *THE RIGHT TO COUNSEL*

■ Billy McCamey contends that his attorney Donna Smith was operating under an actual conflict of interest during the waiver hearing. He contends that his rep-

---

**12.** In *Chapman* the court adopted the general rule that a constitutional error did not automatically require reversal but that a harmless error analysis should be performed. The court has since found harmless error analysis appropriate in multiple cases involving fundamental constitutional error including in a case where there was an unconstitutionally overbroad jury instruction was used in the sentencing phase of a capital case, *Clemons v. Mississippi*, 494 U.S. 738, 752–754, 110 S.Ct. 1441, 1450–1451, 108 L.Ed.2d 725 (1990); in

the granting of the jury instructions including an erroneous conclusive presumption, *Carella v. California*, 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989); and in the erroneous admission of coerced confession, *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) See *Arizona v. Fulminante* at 306, 111 S.Ct. 1246 for a more exhaustive list of cases where the Court found that harmless error analysis was appropriate in determining if constitutional error would result in a reversal.

resentation was adversely affected by the conflict of interest and that prejudice should be presumed and habeas relief granted. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). He argues that he never waived this conflict of interest. McCamey's Sixth Amendment right to counsel includes the right to effective assistance of counsel including the right to be represented by conflict-free counsel. *Glasser v. U.S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978): *Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *United States v. Vaquero,* 997 F.2d 78, 89 (5th Cir.1993) (The Sixth Amendment right to counsel includes the constitutional right to "representation that is free from any conflict of interest.")

As mentioned above in the definition of issues there are multiple sub issues of the law to be resolved. Preliminarily the court must resolve what standard of review as applicable to this issue and what law governs the petitioner's burden to prove this claim.

## 2. *STANDARD OF REVIEW*

McCamey contends that the Mississippi courts have not adjudicated his conflict of interest claim on the merits and that therefore this court should review the merits of the claim *de novo* rather than pursuant to the deferential standard of review set forth in the AEDPA. The respondents contend that there has been a resolution on the merits of the claim and AEDPA's standard of review is applicable. The Mississippi Court of Appeals opinion effectively folds the conflict of interest claim into the impartial jury trial issue. It discusses in detail whether McCamey waived his right to be tried by a fair and impartial jury. It then rather confusingly concludes that the McCamey has waived all of his rights. The Mississippi Supreme Court rejected McCamey's petition for postcon-

viction relief with the terse finding that his claims were "procedurally barred and/or without merit." The state courts need not write any detailed explanation for their rulings in order for the restrictive standards of the AEDPA. Regardless of the brevity or quality of the decision, the state court purported to decide this issue on the merits. Thus the issue raised on conflict of interest and ineffective assistance of counsel during the waiver hearing is not subject to deny *de novo* determination. *Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir.1997). Additionally, factual findings are presumed to be correct and this "deference extends not only to express findings of fact, but to the implicit findings of the state court." *Garcia v. Quarterman* 454 F.3d 441, 445 (5th Cir.2006).

## 3. *APPLICABLE LAW*

McCamey contends this case must be evaluated under *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *Cuyler* involved in a conflict of interest arising out of multiple representation. John Sullivan and two other individuals were indicted for the murder of a union leader. All three had been present in the building at the time the victim was apparently murdered. All three were represented by two privately retained attorneys. On motion for postconviction relief, one of these attorneys admitted being concerned that proceeding forward with a defense in Sullivan's case might prejudice the defense of the remaining defendants. Sullivan's case rested without putting on a defense. Sullivan was convicted. Sullivan's two co-defendants were tried separately and acquitted of the murder charge.

There was no suggestion that the trial court had any inkling of the conflict of interest under which Sullivan's attorneys operated. No objection to the conflict of interest was made at trial. The court in *Cuyler* stated "in order to establish a violation of the Six Amendment, a defendant

who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. 1708. Once this showing was made prejudice would be presumed to have resulted but need not be proven.

■ The respondents submit to the contrary that *Cuyler* is inapplicable. They argue that under *Beets v. Scott*, 65 F.3d 1258 the *Strickland* standard rather than *Cuyler* is the appropriate framework for addressing conflicts of interest involving attorney self-interest.

In *Beets* the alleged conflict of interest grew out of the assignment of literary and media rights arising from her case by Bettie Lou Beets to her attorney's son. This was Beets' means of compensating her defense attorney. Beets asserted that her attorney was a material witness who should have withdrawn from the case and testified on her behalf. She claimed that his interest in the literary rights contract explains his failure to withdraw and appear as a witness.

As with *Cuyler*, the trial judge had no knowledge of the potential conflict until after the trial. The Fifth Circuit Court of Appeals found that the standard enunciated in *Strickland v. Washington* should be used in analyzing conflict arising from the self-interest of attorneys. The Fifth Circuit Court of Appeals held that the presumed prejudice standard of *Cuyler* and related cases were limited to the problems of conflicts arising out of multiple representations.

Addressing the case of *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), the Fifth Circuit found that the representation of employees by an attorney retained by their employer, who appeared to be representing the employer's interest rather than the employees' interest, was considered to be tantamount to multiple representation and, therefore, not

an extension of *Cuyler* beyond multiple or serial representation cases. The Fifth Circuit held "in the absence of controlling authority, we must decide whether, when a lawyer places his self-interest above that of the client, the resulting conflict deserves *Cuyler's* "not quite per se" rule of prejudice or *Strickland's* more deferential standard of attorney competence." *Id.* at 1269. Noting that "[w]here the obligation to a single client is concerned, the duties of loyalty and competence are in intertwined," *Id.* at 1270 and because the consequences of a breach of the duty of loyalty on the "quality of representation range from wholly benign to devastating," *Id.* at 1271, the Fifth Circuit Court of Appeals elected to apply the *Strickland* standard.

Under this standard a defendant complaining that his attorney was operating under an actual conflict of interest would be required to prove both that the attorney's conduct was constitutionally deficient and that that deficiency resulted in actual prejudice to the defendant's case. In *Beets* the court disagreed that there was a conflict of interest or prejudice, finding that the attorney's proposed testimony would have been largely cumulative.

McCamey counters this argument asserting that the terms of the AEDPA control and render *Beets* inapplicable. A cogent argument can certainly be made that *Beets*, which predates the enactment of AEDPA, was superseded by that statute's contraction of applicable federal law to only that enunciated by the United States Supreme Court. However, in the years following the enactment of the AEDPA not only has the Fifth Circuit repeatedly reaffirmed its holding in *Beets*, but other jurisdictions have concurred and adopted it rule. *Caban v. U.S.*, 281 F.3d 778, 782 (8th Cir.2002); *U.S. v. Young*, 315 F.3d 911, 914 (8th Cir.2003); *U.S. v. Leggett*, 81 F.3d 220, 227 (D.C.Cir.1996) Other circuits have disagreed, finding that in the absence

of binding authority to the contrary from the Supreme Court, *Cuyler* does apply to other types of conflict. *Rubin v. Gee*, 292 F.3d 396 (4th Cir.2002) (attorney self-interest conflict arising out of large retainer fee agreement which resulted in adverse effect to the representation and the failure to pursue a plausible defense strategy); *Bonin v. Calderon*, 59 F.3d 815, 825 (9th Cir.1995) (*Cuyler* standard is applicable to conflicts of interest growing out of attorney self-interest.); *Spreitzer v. Peters*, 114 F.3d 1435, 1451, n. 7. (7th Cir.1997) (We have routinely applied both the *Cuyler* and *Holloway* standards to conflict of interest cases which are not multiple representation cases).

Additionally, the United States Supreme Court in *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), favorably referenced *Beets* in dicta. *Mickens* indicates at least the possibility that the United States Supreme Court may ultimately concur with the Fifth Circuit about the wisdom of not applying the *Cuyler* standard "'unblinkingly' to 'all kinds of alleged attorney ethical conflicts.'" *Mickens*, 535 U.S. at 174, 122 S.Ct. 1237, quoting from *Beets*, 65 F.3d at 1266. In the absence of a definitive ruling from the United States Supreme Court rejecting *Beets*, this court has no choice but to apply the law of the circuit.

Thus in order to prevail it must be shown that Smith had an actual conflict of interest that manifested as a constitutionally deficient performance by Smith with resulting prejudice to McCamey. Also, McCamey must show that he has not in fact waived his rights under this ground. It must be shown that the state court determination on this issue is an unreasonable application of or contrary to federal law.[13]

13. The undersigned has applied the Strickland standard pursuant to *Beets*. Nevertheless the undersigned suggests that in the rare circumstances presented by this case, the appropriate standard is in fact enunciated under *Holloway* and *Glasser*. While it is true that no objection was made to the conflict of interest and that the conflict involved arising from attorney self-interest, not multiple representations, *Holloway–Glasser* still seems the most appropriate standard because the issue of conflict of interest was before the court in time to deal with it effectively at the trial level when it arose after the jury was polled. The trial judge expressly recognized the conflict of interest existed for Smith arising out of the witness/lawyer conflict. There can be no reason for not likewise charging him with the knowledge of the intimidation and lack of zeal on the part of Smith brought about by his anger.

Finally like the judge in *Glasser*, the trial judge in this case did not merely fail to correct a conflict of interest, he in fact created one. In *Glasser* the conflict was created by the trial judge's appointment of Glasser's counsel to represent a co-defendant. Here the conflict was created by the trial judge seeking to have McCamey waive an ineffective assistance of counsel and his other rights arising from Smith's conduct while Smith and only Smith had a responsibility to represent McCamey. Considering that Mississippi law otherwise preserved McCamey's rights during Smith's representation, the institution of the waiver hearing took Smith's conflicts from potential to present and actual. The trial judge is charged with the knowledge that Smith cannot appropriately counsel Billy McCamey to waive his rights involving her conduct.

It will be the rare case indeed in which the trial judge knows at trial of an actual conflict of interest arising out of counsel's self-interest, let alone cases in which the judge's actions help trigger conflicts between counsel and their client. But when the trial court has this knowledge and involvement, and the opportunity to avoid damage due to a conflict by removing the attorney, the judge should be required to do so. If the judge fails to act to protect the defendant from a known actual conflict of interest, regardless of the origin of the conflict, the defendant should be allowed a new trial without necessity of being able to meet *Strickland* or even *Cuyler*, but rather *Holloway–Glasser*.

### 4. WHAT IS AN ACTUAL CONFLICT OF INTEREST

This court must determine if Smith acted under an actual conflict of interest. The Fifth Circuit has said, "A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties." *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir.1993) (internal quotations and citations omitted). Rule 1.7(b) of the Mississippi Rules of Professional Conduct provides,

> A lawyer shall not represent a client if the representation of that client may be materially limited by ... the lawyer's own interests, unless the lawyer reasonably believes: (1) that the representation will not be adversely affected; and (2) the client has given a knowing and informed consent after consultation. The consultation shall include explanation of the implications of the representation and the advantages and risks involved.

 The Comments to this rule states, "If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for a lawyer to give a client detached advice." Nor is an attorney's opinion that they have not been impacted by a conflict of interest binding. As the Ninth Circuit recently noted, "[t]he existence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather, court itself must examine the record discern whether the attorney's behavior seems to but have been influenced by the suggested conflict." *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir.1994). See generally, Tigran W. Eldred, "The Psychology of Conflicts of Interest in Criminal Cases," 58 U. Kan. L.Rev. 43, (2009).[14]

In the undersigned's opinion McCamey's counsel was operating under an actual conflict of interest during the waiver hearing and after.

### D. ANALYSIS OF THE WAIVER HEARING AS TO GROUNDS ONE AND TWO

#### 1. JURY SELECTION

 It is apparent that the genesis of all disputes in this case goes back to the fact that Hinton was allowed to serve on the jury. Precisely how did this happen? Because another lawyer had assured Smith that his client in another case would not plead but go to trial, Smith did not expect McCamey's case to go to trial on the scheduled trial date. Therefore, on December 9, 2003, she did not sit in on the qualification of the jury.

At about 11:00 a.m. she was advised by the trial judge that her case was being called for trial and to be ready to select a jury within minutes. She advised her client of the trial and secured civilian clothing for him. She claims in her affidavit that she obtained a "venire as seated" list, (Smith affidavit, Exhibit G to Petition), but confusingly goes on to state, "As I had no identifying data regarding any member of the venire, I began making notes with respect to the venire members' responses to the Court's and the State's voir dire, as well as other identifying data such as race, sex and age as voir dire proceeded." (Ex. G).

**14.** "Psychological research demonstrates that most lawyers—even those who are acting with the best intentions—are unable consciously to identify many conflicts that exist or to appreciate the corrosive effects that such conflicts may have on decision making." Biases toward self-interest in decision-making operate at an unconscious and automatic level. The professional may believe that they have reached a decision based on rational analysis of the pertinent facts, without awareness of the impact of self-interest in the subconscious aspect of decision making.

Any lawyer needs such basic information as the names and general background information for jurors in order to conduct a meaningful voir dire. Smith either failed to obtain the names of panel members or failed to pay attention to the names. As is expected in the relatively small communities of this state, it is common for people to know one another, to have been associated professionally, or through clubs, churches or otherwise with parties and their counsel. Even if the jurors are not personally acquainted, their names may indicate relationships to others with such acquaintance. Smith admits she conducted an essentially blind voir dire. Without the most basic information and review of the juror information cards, Smith lacked information necessary to the exercise of challenges for cause and information needed to allow for the intelligent exercise of peremptory challenges. *See generally, U.S. v. Ledee,* 549 F.2d 990 (5th Cir.1977) ([W]e must acknowledge that voir dire examination in both civil and criminal cases has little meaning if it is not conducted by counsel for the parties. * * * Justice requires that each lawyer be given an opportunity to ferret out possible bias and prejudice.... *Id.* at 993.)); *U.S. v. Rucker,* 557 F.2d 1046, 1049 (4th Cir.1977) (To be meaningful a voir dire examination must bring out sufficient information to permit the defendant an "opportunity to make reasonably intelligent use of his peremptory challenges and challenges for cause." *Id.*). Smith needed to obtain this information and if necessary to ask the court for additional time to obtain information in order to conduct a meaningful voir dire examination.

While McCamey has not raised a claim of ineffective assistance of counsel in connection with the voir dire the undersigned finds that Smith's conduct of the voir dire was at least negligent and that this finding is pertinent to other issues before the court.

## 2. *THE TRIAL JUDGE'S REACTION AND ITS IMPORT*

Smith's belated discovery of Hinton's identity, and her actions in reporting Hinton's presence on the jury to the judge have already been detailed. The judge's angry reaction has likewise been detailed previously. In defense of the trial judge it must be noted that evidentiary hearing testimony established that the circuit judges in the district labored under a heavy criminal trial docket. With limited judicial and prosecutorial resources, no judge would be pleased by the prospect of a third trial.

Nor was the trial judge's assumption that Smith would recognize a former client, who had filed both a bar complaint and a professional negligence claim against her, an unreasonable though ultimately inaccurate, assumption. A judge would reasonably assume Smith would recognize such a client by sight and would also reasonably assume that Smith would have reviewed all the juror's names during the course of the voir dire.

Assuming Smith recognized her client and failed to alert the court to her presence and/or challenge her for cause, leads to the anger provoking conclusion, which this judge clearly reached—that Smith had wasted not only the court's, but prosecution's and the jury's time. The judge no doubt genuinely believed at the time of the sentencing and at the waiver hearing that Smith had in fact "sandbagged" the court. It also leads to the conclusion that she had seriously failed in her duties to her client and her duty of candor to the court. The judge's anger based upon these assumptions is understandable.

Unfortunately, the trial judge was apparently so upset at the prospect of a third trial that he did not at that time listen to Smith's explanation. Certainly from the standpoint of potential ethical violations,

there is a substantial difference between Hinton becoming a juror due to Hinton's apparent dishonesty aided by Smith's deliberate misconduct versus the same results with Smith's part being the result of neglect. The former impugns not merely Smith's competence in this one instance, but her basic integrity and honesty. Clearly, the trial judge during the pertinent time believed that Donna Smith was guilty of deliberate misconduct in this case.

Because of the judge's anger, Smith was very afraid that she would lose her job if McCamey exercised his right to seek a new trial. She admits that she told her client about this concern. The trial judge was one of two judges in this particular circuit with the responsibility and authority for hiring and firing public defenders in their courts. According to McCamey, Smith indicated that she also feared disciplinary action as a result of this case, possibly even disbarment. Disciplinary action was a possibility regardless of any intentional wrongdoing, but certainly if there was a finding of deliberate misconduct, disciplinary action up to and including the possibility of disbarment would be anticipated by a reasonable attorney. Knowing that her conduct was in fact not deliberate would not erase Smith's fears of serious disciplinary consequences. At the time pertinent to the waivers, this is the very real threat Smith faced to her job, her professional reputation and her career. She faced the prospect not merely of losing her job but of sustaining serious long term, possibly irreparable damage to her career.

Having listened to Smith's testimony, the undersigned finds that her explanation for how this series of events happened is credible. The undersigned finds that Smith was not guilty of any deliberate misconduct in connection with the jury selection. Judging by the fact that Smith has retained her employment as a public defender, the undersigned assumes that the trial judge likewise decided at some later point that Smith had not deliberately "sandbagged the court." Nevertheless in evaluating this case, it appears that the trial judge acted under the then existing belief that Hinton's presence on the jury was due to Smith's deliberate misconduct.

### 3. *THE FIRST NEW TRIAL MOTION*

The original motion for a new trial filed by Smith after the sentencing listed as the only claim that the evidence was insufficient to support the verdict (R. 98–99). It contained no reference to the presence of a biased juror. Smith was unclear at the evidentiary hearing about exactly when the motion was filed, but it is clear from a review of the court record that it was filed before the "waiver" hearing. It is filed in the court file before McCamey's affidavit "waiving" his rights, and Smith in the transcript of the waiver hearing indicated that the motion for a new trial had already been filed. (R. 262). As a result the trial judge directed Smith to file a motion for new trial including the "juror" issue. Thereafter an amended motion for a new trial consistent with the judge's orders was filed.

### 4. *THE WAIVER HEARING*

Shortly after the initial motion for new trial was filed, Smith and McCamey were both summoned before the trial judge. There was no formal notice or forewarning of this hearing to either Smith or McCamey. Smith could not recall exactly how she was notified, but she did appear before the judge on short notice. Smith was not allowed in the judge's chambers to say anything to him about the case between the sentencing and the waiver hearing. She remained under "banishment.".

The court began with a synopsis of the status of the case.

BY THE COURT: The defendant was convicted in the Circuit Court of Lowndes County, Mississippi, for possession of two or more methamphetamine precursors chemicals knowing or having reason to believe that those chemicals would be used to manufacture methamphetamine. He was sentenced as an enhanced punishment offender having previous violation of the Uniformed Controlled Substances Act. He was sentenced by the Court and no post-trial motions have been filed or brought to the Court's attention to date. This proceeding is held in open court. The State is represented by the district attorney. Mr. McCamey is present with his attorney, Ms. Smith. (R. 254).

The court then attempted to explain the reasons for this hearing. After Smith's report to the judge, it was important that the judge make sure that McCamey knew what had transpired with the jury.

BY THE COURT: Mr. McCamey, I had you brought back to court because some information has been brought to my attention concerning your trial that I think that you need to know and that you are required to know. Immediately after I discharged the jury, after the jury had found you guilty, your attorney appeared in my chambers and announced to the Court that she had a former client that was sitting on your jury, and that the former client had sued her and obtained a judgment against her. (R. 254–55).

When Smith tried to correct the judge on the details of what had happened between her and Hinton, the judge argued with her about the contents of her report to him.

BY MS. SMITH: Your Honor, to be accurate, she did not obtain a judgment.
BY THE COURT: I'm not being accurate. I'm trying to tell what you told me that I must divulge to him.

BY MS. SMITH: Yes, sir.
BY THE COURT: That's what you told me in chambers.(R. 255).

The court then continued with its view of the facts and explanation for the hearing.

BY THE COURT: And that that was in the state of Alabama is what I was told. I was not aware of that. *The juror did not respond that she knew Ms. Smith during voir dire when asked a question nor did Ms. Smith inform the Court, or counsel opposite, and I assume you, that, that was a former client of hers. Had she done so, that juror would not have sat on your jury.* In any event, you are entitled to know that. (R. 255) (Emphasis added).

In this segment of the colloquy, the judge again makes it apparent that he does not believe that this was an accident, but rather the result of Smith's deliberate misconduct. The judge, however, does not question the accuracy of either Smith's report that she had a former client on the jury or that she and the client had a most serious dispute. This is consistent both with the fact that these reports by Smith are both naturally embarrassing to the attorney and admissions against her interest. They are also facts readily confirmable through third person sources. Once more Smith is not only being confronted by the judge with the bad results flowing from her conduct of the voir dire, but the judge's continuing belief that she deliberately brought about the situation. Certainly the trial judge should be aware at this point that "the probity of" Smith's conduct during the voir dire and the trial were "in serious question." Comment to Rule 1.7(b), Miss. Rules of Professional Conduct. It is also significant to anyone schooled in the law that the judge states unequivocally that if the court had known the truth, Hinton would not have been

allowed to sit on the jury that convicted McCamey. This is the trial judge's tacit acknowledgment that McCamey had in fact been deprived of a fair trial by an impartial jury.

The judge then proceeded:

BY THE COURT: I do not know the relationship that you have professionally with your attorney. I know that she was appointed to represent you based on the papers that are in the court file, and she is a public defender. No post-trial motions have been filed.

If you so desire, I will relieve Miss Smith as your attorney and appoint you another attorney. It may be that Ms. Smith has now placed herself in the posture being a witness, and she cannot be both a witness and your attorney at the same time. You need to tell me whether you wish me to remove her from your case and appoint a new lawyer or not. The decision is yours. R. 255–56.

To this point the trial judge has offered no reference to McCamey's constitutional rights, or explained how those rights have been implicated. In this portion of the colloquy the judge implicitly recognized that Smith had a conflict of interest in that she cannot serve as a witness to show Hinton's disqualification and remain as McCamey's counsel.[15] He nonetheless does not advise McCamey that she in fact had a conflict of interest.

The court continued further:

BY THE COURT: Again, I do not know your relationship with your current attorney. I do not know what you feel about her or her representation of you or anything about it. It may be that you don't want to get rid of her is what I'm trying to say I guess. It may be

that you think that she would be the best attorney you could hope to get. But, I do want you to know the facts as they were related to me. (R. 256).

This portion of the colloquy again references McCamey's relationship with his attorney. It seems to be an implicit invitation for McCamey to consider his attorney's interests-an attorney who has cried during his sentencing. By both McCamey's and Smith's account, she was very upset. The judge also suggested McCamey may want to keep Smith if he believed she would be the best attorney for him. Suggesting that McCamey might want to keep an attorney whom the judge believes has engaged in deliberate misconduct in jury selection resulting in an unfair trial is consistent with Smith's opinion that the purpose of the hearing was "CYA"-designed to obtain a waiver of McCamey's rights if at all possible and thereby avoid a retrial. Even if Smith actions were merely negligent, as the undersigned now finds, suggesting this course to McCamey is not consistent with the judge's responsibilities to protect his rights and assure that he received a fair trial.

The judge further continued.

BY THE COURT: I do not know the truthfulness of them. I do not know what impact it might have on any post-trial motions that might be filed in your case. I cannot speculate as to what rulings might be had on any of those motions or what ultimately might happen. I cannot speculate as to that. But you should be made aware of what I was made aware of so that you can make a decision concerning that. Do you understand what I've explained?

---

**15.** It appears that under Rule 3.7. of the Mississippi Rules of Professional Conduct Smith should have allowed Smith to continue her representation of McCamey only if "(3) disqualification of a lawyer would work substantial hardship on the client."

BY THE DEFENDANT: Yes, sir. (R. 256).

While it is true that the judge lacked personal knowledge of the truthfulness of Smith's assertions about Hinton, there seems to be little doubt about the truthfulness of Smith's representations about their past professional relationship or little anticipation that the facts she asserted would not be readily provable. The trial judge does not appear to in fact entertain any doubts about the accuracy of what Smith had reported. His anger indicates that he credits her report. Additionally, given his earlier statement that had he known the truth, Hinton would not have sat on his jury, disposition of a motion for new trial is not a matter of speculation or conjecture but rather critical information needed by McCamey in order to make an knowing and intelligent decision. At the least, the judge needed to tell McCamey, "If what your lawyer says about her relationship with the juror is true, you were deprived of your right to a fair and impartial jury and will be entitled to a new trial, unless you waive your rights." Because of the trial judge's duty to protect the rights of the accused, McCamey was entitled to know not simply the legally significant facts of his case, he was entitled to be advised of the legal significance of those facts. The legal significance of the facts were known to the judge. It was incumbent upon him to make the appropriate disclosures to McCamey.

The exchange between the court and McCamey continued.

BY THE COURT: Do you have any questions that you want me to answer? And if I can, I will answer them here in open court here in the record concerning that.

BY THE DEFENDANT: Yes, sir. What would be the purpose of me getting a new lawyer? I mean why?

BY THE COURT: He would have to— whoever your new lawyer is what have to tell you that. (R. 256–257).

Here McCamey is directly asking why he should get a new lawyer. The judge had a responsibility to explain to McCamey why he should obtain a new lawyer. The truth is that McCamey's lawyer had a conflict and should have been disqualified, over McCamey's objection if necessary. The failure to conduct a proper voir dire and have Hinton removed resulted in a trial before a biased jury. McCamey needed a new lawyer to present these crucial issues. The judge failed to take the appropriate steps to remove Smith, or at least to fully explain to McCamey why he should ask for new attorney. The judge's discussion and inquiry to this point is focused on a side issue-"Do you want a new lawyer?" Even on the side issue the judge failed to offer any explanation of the hazards of Smith's representation to her client. McCamey was entitled to know that with a new attorney a new trial was a virtual certainty.

McCamey then went further to say "because I have no problem with her representation. To me it was fine. It was nothing wrong with that. (R. 257) This statement by McCamey is particularly telling. Clearly McCamey does not understand the significance of what has happened and its impact on him. Smith's actions and failure to act, whether deliberate or negligent, have deprived McCamey of a fair, unbiased jury. That Smith is subject to a strong claim of ineffective assistance of counsel in allowing her former client to remain on the jury is the primary conflict of interest. That she may also be a necessary witness to establish her failures in this regard is secondary to and dwarfed by this other conflict. McCamey's statements show an utter and complete lack of understanding to him of

what has happened and Smith's culpability for what has happened. Instead of either removing Smith, who clearly has a conflict and *sua sponte* appointing new counsel, or explaining the significance of what has happened, the trial judge again states the facts.

BY THE COURT: She had a client—a former client who had sued her on your jury.

BY THE DEFENDANT: Yes, sir.

BY THE COURT: She did not tell the Court or anyone else about that, nor did the client respond to that question when asked specifically about that by me—

BY THE DEFENDANT: Yes, sir.

BY THE COURT:—when we were selecting a jury.

BY THE DEFENDANT: Yes, sir.

BY THE COURT: I assume you recall the questions that I asked.

BY THE DEFENDANT: Yes, sir.

BY THE COURT: "Do any of you know Ms. Smith or any immediate members of her family?" There was no response from that particular juror. (R. 257).

The foregoing recites the facts, the significance of which could not have been missed by any lawyer hearing them, but it does not explain the significance of those facts to the one person in the room who needed to understand the significance and have it clearly explained to him.

The trial judge continued:

BY THE COURT: If you are satisfied with Ms. Smith's representation, it may be that you waive or give up certain arguments or legal arguments that you might have either on a motion for a new trial or on appeal. It is a decision you have to make. (R. 257).

The judge is suggesting a waiver in order to retain Smith but he is not explaining the legal arguments that McCamey would be giving up or the practical impact on any motion for a new trial. He makes

mention of the possibility of the waiver affecting appeal but does not explain what he means nor does he make any mention of post conviction relief. The judge is also again suggesting that McCamey may be satisfied with Smith's performance, when the judge's knowledge at that point in time indicates that Smith's performance is anything but satisfactory.

BY THE COURT: She is still your attorney. If you want to ask her about them, you can. If you want another attorney, I will appoint you another attorney. The decision will have to be yours.

BY THE DEFENDANT: I understand. (R. 257–258).

The judge again highlights the side issue, the possible replacement Smith with new counsel, rather than advising McCamey of his right to a fair jury and the fact that he did not get one. He does not comment on Smith's conflict of interest. He leaves McCamey to seek advice from Smith when he has to understand that her personal interests are adverse to McCamey's.

The judge then ordered McCamey held in lockup at the courthouse until he was ready to give a response on the record. This additionally created an element of time pressure on McCamey. This portion of the colloquies between judge and defendant ended with McCamey thanking the trial judge for letting him know what had happened.

## 5. CONSULTATION WITH SMITH AND OTHER COUNSEL

During what the record notes as a brief recess, Smith and two other attorneys consulted with McCamey. The undersigned finds that this consultation was implicit recognition by Smith that she had a conflict of interest requiring independent counsel. However, she never advised her

client that she had any conflicts of interest. No one mentioned any conflict of interest to McCamey much less explained those conflicts to him. Smith admits that she told McCamey that she was likely lose her job if he asserted his rights. She also says that she nevertheless urged him not to waive his rights. She testified that she advised him that he had a right to get a new trial and the right to a fair and impartial jury. Nothing in the written record corroborates that Smith expressly named the rights implicated in her discussions with McCamey. Every written reference by Smith is, like the judge's references, to the problem of the juror.

Though Smith sought to have some of her colleagues counsel with McCamey, this was inadequate. She had prior to consultation with other attorneys placed her personal concerns before her client. Only after he indicated that he wanted to waive his rights did she decide to get other attorneys to counsel with him.[16] Smith ultimately only had one option as an ethical, effective attorney and that was to withdraw as counsel for McCamey. She could do so prior to any waiver by McCamey. Alternatively, as she admitted at the evidentiary hearing, she could have refused to allow McCamey to waive his rights and to intercede as his advocate and advise the court that McCamey, regardless of his expressed wishes, was not going to be waiving any of his rights. This action would have disqualified her as his counsel and

triggered a new appointment. Additionally, Smith can no more counsel Billy McCamey to effectively to waive an ineffective assistance of counsel claim against her, than she may pursue such a claim on his behalf where her failings are the subject of the claim.

The court being advised that McCamey had reached a decision reconvened.

BY THE COURT: 2002–0708–CR1. I had spoke to Mr. McCamey about the possibility of obtaining new counsel, and he wanted a period of time to think about it and discuss the matter with his current court-appointed counsel. Have you done that Mr. McCamey?

BY THE DEFENDANT: Yes, sir.

BY THE COURT: Do you wish the court to appoint new counsel for you?

BY THE DEFENDANT: No sir.

BY THE COURT: Do you understand that means that you will be giving up *maybe a ground* that you have all for a motion for a new trial?

BY THE DEFENDANT: Yes, sir.

BY THE COURT: And do you also understand that *you may also be giving up a ground that you have on appeal;* do you understand that?

BY THE DEFENDANT: Yes sir.

BY THE COURT: That's been explained to you?

BY THE DEFENDANT: Yes sir.

---

16. See generally, Tigran W. Eldred "The Psychology of Conflicts of Interests in Criminal Cases, 58 U. Kan. L. Review 43, 77–79 (2009), on decision making biases in clients which make disclosure of a conflict of interest to the client an ineffective remedy to the conflict. According to Tigran, clients will tend to rely on and accept biased advice "even when they should know better." *Id.* At 78. Three explanations are offered based upon psychological research. The first information received has "a powerful influence on the end result, even when one knows that it comes from a biased source." This is known as an anchoring effect. Even when an individual subsequently learns that the source of the advise was biased it is difficult to discount the advice. Additionally people have difficulty trying to unlearn information, even when later advised that it is inaccurate. Finally because of what is known as the correspondence bias people find it difficult to discount advice from someone who is in a trusted position such as an attorney. McCamey to this day clearly trusts and respects Smith.

BY THE COURT: Please prepare me an affidavit to that effect. That he's been explained all that and put it in the record in this case. I would also think that it ought to be included in the motion for new trial. (R. 258–59) (Emphasis added).

The judge again asked him if he wants a new attorney. McCamey declines. He names none of the rights McCamey will be waiving. The only addresses the waivers as "maybe a ground" for a new trial or for appeal as if a mere side effect of not requesting a new lawyer. If there were any doubt about the motivation for McCamey not asking for new counsel, his next statements make it clear to the court that his actions were motivated by his desire to protect Smith. He said

BY THE DEFENDANT: Your Honor?

BY THE COURT: Yes?

BY THE DEFENDANT: She did tell me earlier that this—she had already told me before I ever came in here the first time what had happened. Just let you know that she had already told me.

BY THE COURT: I assume that she did, but the record must know [sic] itself that I told you.

BY THE DEFENDANT: Oh, yes, sir. Okay. I understand. I was just letting you know that she had—she wasn't trying to, you know, like, keep it from me or nothing. She did tell me. (R. 259).

The trial court then addressed waiver.

BY THE COURT: The motion for new trial could contain that as an error in your trial. And if it did, Ms. Smith would be a witness. And she cannot be your lawyer and a witness at the same time.

BY THE DEFENDANT: Yes, sir.

BY THE COURT: So, if she remains your counsel as you request, that means that you give up the right to raise that in a motion for a new trial.

BY THE DEFENDANT: I understand.

BY THE COURT: It also is going to mean that you—and this will be included in the affidavit. If the motion for new trial is overruled and you appeal to the Mississippi Supreme Court, Ms. Smith will be your counsel for appellate purposes.

BY THE DEFENDANT: Yes sir.

BY THE COURT: She cannot, herself, raise ineffective assistance of counsel argument. She cannot claim that she—that you were denied effective assistance of counsel because of this because it would be her that she'd be talking about.

BY THE DEFENDANT: Right.

BY THE COURT: Another attorney could on direct appeal, but she can't. (R. 259–260).

This part of the colloquy is a correct statement of Mississippi law. Smith cannot in fact function as a witness and his counsel. Nor does Mississippi law allow Smith to raise her own ineffectiveness. *Archer v. State,* 986 So.2d 951 (Miss.2008) ("[A] self-ineffectiveness claim is absolutely inappropriate and must not be permitted.* * * The only means by which a reviewing court adequately can ensure that a criminal defendant represented on appeal by his or her trial counsel has the opportunity at least to fully raise an ineffectiveness claim is via a post-conviction proceeding. *Id.* at 956). Here for the first time the judge mentions the potential ineffective assistance of counsel claim. The judge neither explains this ground nor takes any steps to assure that McCamey actually understands the issue. Smith purportedly addressed the ineffective assistance of counsel claim with McCamey, a subject matter on which she could not be more clearly conflicted. There is no indication of what advice she gave him in the record. The only other matter in the record from the evidentiary hearing regarding the ineffective assistance of counsel

claim has been Farrow's comment that he has no recollection of addressing the ineffective assistance of counsel claim with McCamey but assumes that he did. The state court record does not have any mention of this claim other than the judge's mention. There is no showing that McCamey was given any legal advice on the merits of this claim. Without any knowledge of the merits of his claim, any waiver cannot be knowingly and intelligently made.

The trial court then contended or mentioned for the first time that a waiver of the ineffective assistance of counsel claim at that time would extend to any subsequent proceedings.

> BY THE COURT: Which also is going to mean that on—if the supreme court affirms your conviction, any post-conviction collateral relief action that you might file as an inmate with this Court, you cannot raise ineffective assistance of counsel because of that issue either. What all this means is that you are waiving or giving up the right to raise that or question that issue ever again. You understand that?
>
> BY THE DEFENDANT: Yes, sir. (R. 260–261).

This part of the court's explanation is the first time that anybody brings up waiver of post-conviction collateral relief. This information is provided to McCamey only after he has already stated that he would waive his rights. The judge does not explain what postconviction relief is or make any attempt to assure that McCamey in fact understands. There is no showing that anybody counseled McCamey regarding waivers at the appellate or postconviction level. Farrow himself did not understand or appreciate that the failure to obtain new counsel would work a waiver of the issue for appellate and collateral relief purposes. Additionally, the trial judge is imposing a waiver on McCamey under circumstances where Mississippi law has been held to reserve the defendant's right to assert the claim at a later time. Had the judge done nothing except advise McCamey of what had happened with Hinton, Smith could have continued to represent McCamey through the direct appeal. She could not raise ineffective assistance of counsel on direct appeal, but McCamey's right to raise that issue would have been preserved for postconviction relief. The judge's actions during the waiver hearing deprived McCamey of his one fair bite at the apple; at developing the ineffective assistance of counsel claim that *Archer* and the United States Constitution would have guaranteed.

> BY THE COURT: Okay that's what I wanted the attorneys to explain to you.
>
> BY MS. SMITH: Your Honor, just for the record, he has received independent advice from Ms. Jourdan as well as Mr. Farrow on this, also.
>
> BY THE COURT: Okay. It might be that that needs to be included in the affidavit.
>
> BY MS. SMITH: Yes, sir. (R. 261).

After extracting a waiver of the juror issue and ineffectiveness of counsel issue, the judge said "Okay. Just want to make sure you—everybody needs to know everything. Nobody needs anything kept him from anybody." (R. 261). The judge has never mentioned McCamey's right to a fair trial before an impartial jury. He has not told McCamey anything about any conflict of interest by his attorney. He has not explained any of the ramifications of any conflict of interest by his attorney. He has allowed an attorney he has to know has an actual conflict of interest to counsel the client. He has never asked for a waiver of, nor has McCamey expressly waived his right to have a fair trial before an impartial jury. He has obtained a waiver with-

out McCamey having a full and true picture of his circumstance.

The trial judge also obtained a waiver under circumstances where no reasonably competent lawyer would allow their client to waive these fundamental constitutional rights without any compensating benefit to the client. This waiver happened because Smith had clear, actual conflicts of interest. By her testimony she was so intimidated by a judge's anger that she believed he would fire her if her client exercised his rights and obtained another trial. No attorney under those circumstances is capable of zealously representing their client's interests, and only their client's interests.

Only after the waiver hearing and acting on instructions from the judge does Smith file an amended motion for new trial raising the juror issue.

### E. FURTHER ANALYSIS OF GROUND ONE

Our circuit court has recently discussed just how central the right to a fair and impartial jury is to our system of justice in assuring due process and a fair trial to the accused. In *Virgil v. Dretke*, 446 F.3d 598 (5th Cir.2006) the defendant's trial counsel failed to challenge members of the venire who admitted during voir dire that they could not be fair and impartial jurors. This jury found Virgil guilty of causing physical injury to an elderly person and sentenced him to 30 years.

The failure of his attorney to have the jurors removed either for cause or peremptorily was assigned as ineffective assistance of counsel. The state court rejected this claim. The federal district court likewise rejected Virgil's habeas petition. The Fifth Circuit Court of Appeals reversed finding that the state court determination that Virgil had not received ineffective assistance of counsel was unreasonable. "Our criminal justice system rests firmly on the proposition that before a person's liberty can be deprived, guilt must be found, beyond a reasonable doubt, by an impartial decision-maker." *Id.* at 605. The Fifth Circuit noted that the "Supreme Court has unfailingly protected the jury room from juror bias in a variety of contexts" including instances where a jury pool might be tainted by publicity, *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. 1639, or by improper prosecutorial peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79, 90, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)(use of peremptory exclusions on the basis of race is constitutionally prohibited); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (jurors may not be excluded solely on account of gender). "[T]his is consistent with the Court's long-held view that the impartial jury is critical in determining guilt and punishment." *Virgil*, 446 F.3d at 606, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

The Fifth Circuit Court of Appeals stated "most relevant here are the Supreme Court decisions concerning biased decision-makers. Starting with *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the court has consistently found a breakdown in the adversarial process when the judge has a direct financial interest in the outcome of the proceedings." *Virgil*, 446 F.3d at 605–606. The Fifth Circuit, citing to the United States Supreme Court, found that an unbiased decision maker is not optional in any fair trial. "The clarity of the Supreme Court's reading of the simple command of the Sixth Amendment-guaranteeing that liberty will not be deprived until guilt is found beyond a reasonable doubt by an impartial jury-is evidenced by its consistent application by

our sister circuits under factual circumstances quite similar to those in this case." *Id.* at 606.

The Fifth Circuit Court of Appeals then discussed these earlier decisions. In its own case, *United States v. Nell*, 526 F.2d 1223 (5th Cir.1976), the Fifth Circuit had found actual bias where a venire person had expressed a strong dislike for unions. It noted "[d]oubts about the existence of actual bias should be resolved against permitting the juror to serve." *Id.* at 1230. In *Hughes v. United States*, 258 F.3d 453, 456 (6th Cir.2001), as in *Virgil*, a defense attorney failed to remove or challenge venire members who admitted on voir dire that they could not be fair and impartial. In that case the Six Circuit Court of Appeals found actual bias and ineffective assistance of counsel. The Fifth Circuit also noted with approval statements of the Eighth Circuit Court of Appeals and Tenth Circuit Court of Appeals on the absolute necessity of an unbiased jury. *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) ("Trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism."); *Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir.2000) (recognizing that prejudice results when defense counsel fails to attempt to remove from the jury a person who has been established on voir dire to be biased.)

The Fifth Circuit further stated:

[W]e are also mindful that certain errors in the trial process are 'so basic to a fair trial' as to defy harmless error review. It is clearly established that this Supreme Court views the denial of the right to an impartial decision-maker to be such an error that taints any resulting conviction with constitutional infirmity. Although we do not hold that a structural error alone is sufficient to warrant a presumption of prejudice in the ineffective assistance of counsel con-

texts, the fundamental nature of such rights-including the right to an impartial jury-serves as an important guidepost in our evaluation. .... [T]he Supreme Court's treatment of the right to an impartial jury is more than a mere backdrop to our analysis; it is the lens through which we must examine counsel's performance in this case."

*Virgil,* 446 F.3d at 607, citing *Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (the presence of a biased decision-maker is a structural error subject to automatic reversal); *Edwards v. Balisok,* 520 U.S. 641, 647, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Brecht v. Abrahamson,* 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (Trial errors that occur during the presentation of the case to the jury are subject to harmless-error analysis. "At the other end of the spectrum of constitutional errors lies 'structural defects' in the constitution of the trial mechanism, which defy an analysis by the 'harmless-error' standard' and require automatic reversal." *Id.*); *Johnson v. United States,* 520 U.S. 461, 469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) ("[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis.") and *Tumey,* 273 U.S. at 523, 47 S.Ct. 437.

The Fifth Circuit held that the failure to challenge the jurors who admitted bias was ineffective assistance of counsel. This resulted in a structural defect in the trial that denied Virgil a fair trial. The court held that the results of his trial could not stand. "Given the fundamental nature of the impartial jury and the consistent line

of Supreme Court precedent enforcing it, we must conclude that 'the result of [Virgil's trial] is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *Virgil,* 446 F.3d at 613, quoting from *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052.

In McCamey's case Martha Hinton did not expressly state that she could not be fair and impartial. But her deception, her act of lying by omission during voir dire, is equally indicative of bias perhaps more so than the comments by the jurors in *Virgil.* She failed to reveal her past relationship with Smith, not only in the face of an unambiguous question directed at any relationship with Smith, but also in the face of questioning which unambiguously indicated to any member of the venire panel that a past professional relationship was of particular significance in determining her qualification to sit on the jury. Hinton's deception corroborates a finding of animus towards Smith growing out of the fact that she was not satisfied with pursuing a professional negligence claim but also sought to have Smith professionally punished for the mistake in her case. The Mississippi courts have recognized Hinton's bias, that she was subject to being challenged for cause and the failure to remove her denied McCamey with an impartial jury. As the Fifth Circuit said, "The jury box as a holy place." *Nell,* 526 F.2d at 1229. It was not a place where Martha Hinton belonged.

Given the strength of McCamey's claim for new trial either by a motion for new trial or on appeal; given the fundamental constitutional flaw in that trial which amounts to no trial; how could any defendant, competently counseled, knowingly and intelligently waive his right to a fair trial especially after receiving such a sentence so substantial? If such is possible, it certainly did not occur in this case. While it is true that defendants routinely waive their rights to trial and plead guilty, those pleas and waivers are supported by plea agreements and/or by other perceived benefits to be derived from the waiver and plea. Such is not the case with McCamey.

The undersigned finds that the trial judge sought a waiver of fundamental constitutional structural error under circumstances where no waiver would be attained upon full and proper disclosures by the court and appropriate advocacy by counsel. The numerous deficiencies in the trial judge's disclosure to McCamey have been set forth above. The trial judge never tackled the rights he sought waiver on directly but attempted to approach them obliquely by asking McCamey if he wanted a new attorney.

The respondents assert that the trial judge did everything but name the rights that McCamey was waiving. The undersigned disagrees and finds that the failure to name the rights is in fact a crucial failure. Even for a person of limited education and intellect, maybe especially for such a person, a fundamental constitutional right must be named to be "known." There is a vast difference between being told, "You have a right to a fair and impartial jury, and the jury that convicted you wasn't fair and impartial" and being told "Since you want to keep your lawyer you are giving up 'maybe a ground' on the juror problem." In this case the failure to name the right, coupled with the other omissions, shows that the purported waiver by Billy McCamey of his right to a fair trial before an impartial jury was not knowingly and intelligently made.

Additionally, because Donna Smith had conflicts of interest with her client at the time of the waiver hearing, on the subject matter of the waiver hearing, McCamey's decision was worse than merely uncounseled. The decision of the Mississippi courts that Billy McCamey knowingly and intelligently waived his right to a fair trial

before an impartial jury appears is more easily understood as a de facto application of the harmless error analysis to a defendant they believed to be guilty.[17] If so their determination is not merely an unreasonable application of federal law, but also clearly contrary to federal law as determined by the United States Supreme Court.

### F. FURTHER ANALYSIS OF GROUND TWO

From the above review of the record it is obvious that the undersigned is of the opinion that Smith was acting under one or more conflicts of interest. The respondents take the position that Smith only had a potential conflict of interest based on the possibility of being called as a witness in the event that there was a motion for new trial to challenge Hinton's presence on the jury. The undersigned disagrees.

The opinion of the Mississippi Court of Appeals does not support the respondents' position. The state court did not find that Smith had no conflict of interest, or only a potential conflict of interest. The court ruled that McCamey had waived the conflict of interest. Implicit in that ruling is that an actual conflict of interest existed. While it certainly aids the respondents' cause to imply that there was no conflict of interest, particularly if aided by AEDPA's allowance that the state court could get its ruling wrong as long as not unreasonably wrong, it is the respondents who are trying to undermine the ruling actually made

by the state court. Alternatively, the undersigned would suggest that Donna Smith, while undertaking to represent McCamey at the waiver hearing was operating under three related conflicts of interest and that any holding by the state court to the contrary represents an unreasonable application of federal law to the facts of this case.

Because of the judge's anger at her, coupled with his power to fire her, Smith feared she would lose her job if her client exercised his rights. These fears meant Smith's interests at the time of the waiver hearing were actually adverse to her client's interest. The conflict grew out of her blunder in handling voir dire in part and out of the judge's angry reaction in part. Smith has effectively admitted this conflict. She has both provided an affidavit and testified live before the court that when McCamey asked her what would happen to her if he exercised his rights, she told him that she believed she might be fired. A zealous, competent attorney, not subject to concerns about her job and professional future, would not have allowed McCamey to waive a winning issue on the motion for new trial and/or appeal. Doing so effectively doomed McCamey to the 33 year sentence and threw away any realistic hope for relief on appeal. Competent lawyers do not let client's waive reversible error without any consideration.

Smith was asked if she could not have simply refused to let McCamey waive his rights and act on his behalf. Smith ac-

---

**17.** Even if a harmless error analysis were appropriate, the error in this case cannot be said to be harmless beyond a reasonable doubt. *Satterwhite v. Texas*, 486 U.S. 249, 258–259, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) The undersigned notes that in another portion of its opinion the Mississippi Court of Appeals held that the evidence against McCamey was overwhelming. While the evidence is certainly sufficient, if credited and accepted by an impartial jury to support a

conviction, there is other evidence which if accepted by jury would lead to an acquittal. Most telling on this question though and ultimately the most compelling proof that the denial of a fair and impartial jury cannot be deemed harmless in this case is the fact that this was McCamey's second trial on this charge. An earlier, presumably impartial jury had considered the evidence but been unable to reach a verdict.

knowledged she could have and ultimately that she should have prevented the waiver Certainly the trial judge's reaction to what had happened effectively created and or contributed to the conflict between Smith and McCamey because it was the judge's anger which presented the threat to Smith's job and potentially her career. The respondent's assertions that the trial judge had no knowledge of any conflict of interest because no objection was placed on the record is rejected. The judge was perfectly aware of the circumstances given rise to this conflict. Both in and out of court judges are routinely called upon to instruct, direct, advise admonish, chastise, scold, reprimand and sanction attorneys appearing before them as appropriate. Telling any lawyer, let alone one you have hired and can fire, to "get the hell out" of your chambers is not a routine occurrence in the judiciary. Keeping such a lawyer banned from returning into chambers, even with counsel opposite present, is also significant. It is unreasonable to presume that the judge was oblivious to the natural consequences of his anger toward Smith.

While it is true that Smith says she actually told McCamey that he should not waive his rights, after crying through his sentencing, being "very upset and intimidated" at the waiver hearing and letting her client know the probable consequences to her if he exercised of his rights, McCamey, she testified, waived his rights out of his "misplaced concern" for her. No doubt, her expressions of the bad consequences to herself were more convincing than claims that she did not care about her job. Her fears for her job and career could not help but erode her zeal in advising McCamey not waive his rights.

Secondly, Smith had an actual conflict of interest growing out of the anticipated need for her to be a witness at a motion for a new trial based on the fact that McCamey's jury was not fair and impartial. Unlike the situation in *Beets*, where the proposed testimony was cumulative, it was only prudent to anticipate that she would have to testify at a hearing on a motion for a new trial. It is also apparent that proceeding with such a meritorious motion was not merely in her client's interest, but mandatory for any reasonably competent attorney zealously representing their client. By both what the trial judge and the appeals court have said, and the facts which Smith knew to be true, the fair and impartial jury trial issue was a clear winner for her client, though sure to be damaging to her interests as an attorney. Thus Smith had an actual conflict of interest from the point of her discovery of Hinton's presence on the jury through the end of her representation of McCamey.

■ The third conflict arose when the trial judge at the second section of the waiver hearing sought a waiver of McCamey's rights to make an ineffective assistance of counsel claim growing out of Hinton's presence on the jury. A lawyer cannot ethically seek a waiver of their client's rights and claims against the attorney because of the conflict between the lawyer's and the client's interest. By her account Smith counseled McCamey on the potential claim for ineffective assistance of counsel, but such advice was given with the conflict. A four or five minute consultation with some of Smith's friends in the defense bar who were not representing McCamey, all without a word from anyone about her conflict, does not negate the conflict, waive the conflict or prevent harm to the client from the conflict. She had an actual conflict of interest-what was best for her ... a waiver of the ineffective assistance of counsel, and what was best for her client ... pursuit of a strong claim for ineffective assistance of counsel. These interests were irreconcilable.

In her defense Smith was not the one seeking a waiver of her client's rights. The trial judge's action in seeking the waiver created the conflict. Both she and the judge should have recognized the conflict of interest and she should have been removed as counsel. "It is absurd to fantasize that [a] lawyer might effectively or ethically litigate the issue of his own ineffectiveness." *Read v. State*, 430 So.2d 832 (Miss.1983).[18] It is equally absurd to think they may effectively or ethically counsel their clients leading to a valid waiver of the claim. Neither Smith, nor the judge, acknowledged or responded to this and the other conflicts appropriately. When Billy McCamey waived the ineffectiveness of assistance of counsel claim, he was as unrepresented with Smith by his side as if he had been standing alone.

The undersigned finds that continuing to represent a criminal defendant in the face of these irreconcilable conflicts of interests was constitutionally deficient conduct on the part of counsel. The trial court was equally aware of these conflicts and equally responsible for removing Smith. While the undersigned is satisfied that the above findings are sufficient to warrant habeas relief, he will now point specifically to additional deficiencies in the representation growing out of the conflicts of interest.

There are multiple concrete ways in which it is shown that the conflict of interest in this case had a devastating impact on the quality of Smiths' representation of McCamey.

First, even before the waiver hearing Smith did not assign the failure to have a fair trial before an impartial jury on the first motion for new trial.[19] This was as indicated by the trial judge and the Mississippi Court of Appeals, a winning issue. The only issue assigned on the motion for new trial was that there was insufficient evidence to support the verdict. This issue could not be won. The only explanation for the omission of the fair jury issue is Smith's conflict of interest. While Smith cannot present the issue of her own ineffectiveness, she is charged with removing herself from the case when she cannot pursue meritorious claims on behalf of the client because of her conflict.

Additionally, Smith admitted at the hearing that she could simply have insisted on McCamey's rights. At first she attempted to excuse this omission by saying that McCamey was under oath and that he was the one doing the talking. McCamey was not under oath and this is precisely the time when she, and not the client, should have done the talking. Smith admitted that looking solely at McCamey's interests, there was no rational basis for his decision to waive his rights. She also expressly recognized that McCamey's waiver was the result of his, as she says, "misplaced concern" for what would hap-

---

18. The citation to Mississippi case law should not be taken as a reference to McCamey's rights under state law or as attempting to vindicate those rights. Several of the cases have been referred to because they are particularly apropos to the case. These cases reflect both the constitutional problem and demonstrate that the trial judge must be charged under his state's case law with awareness of the conflicts.

19. In fact Smith never referred to the issue as impacting McCamey's fair trial/unbiased jury rights. The affidavit she prepared for McCameys signature refers to the McCamey waiving his right to raise the 'juror issue,' rather than stating that he was waiving his right to receive a fair trial before an impartial jury. The amended motion for a new trial filed only on orders from the trial judge also referred to the 'juror' issue without discussion of the rights implicated by the facts. There is nothing in the written record to corroborate Smith's claim that she discussed the 'fair trial, impartial jury rights by name with McCamey. The court credits that Smith testified honestly as to her recollection, but doubts the accuracy.

pen to her. The respondents assert that the waiver cannot be invalidated because McCamey let concern for his attorney influence his decision. There is no dispute that there is no other basis for McCamey's waiver. McCamey's concern was indeed misplaced, but his concern was the direct result of Smith's statements to him about the potential serious consequences she faced if he exercised his rights. In making those statements, Smith acted in and advanced her own interests to the detriment of her client. McCamey's concern for Smith and his waiver arose from Smith's conflict of interest. The waiver of his rights in favor of his attorney's interest is tainted by and rendered invalid by her conflicts of interest.

The question actually posed by Billy McCamey in his second ground is whether the state court's determination that he waived his right to conflict-free counsel is contrary to, or an unreasonable application of federal law. It is actually a simple question to answer. That state court's holding is completely unsupported by the record both before the state court and that developed before the undersigned at the evidentiary hearing. The respondent's have conceded that no waiver of the right to conflict-free counsel occurred. Without any evidentiary basis to support a finding McCamey waived his right to be represented by conflict-free counsel, this court has no choice but to find that the state court decision is contrary to, and an unreasonable application of federal law, as enunciated by the United States Supreme Court.

### G. *FINAL COMMENTS*

The undersigned is not entirely unsympathetic to Smith. The undersigned routinely reviews records in state criminal court cases during federal habeas actions. Assorted claims of ineffective assistance of counsel are very common. This court has some familiarity with Ms. Smith's work as an attorney. Reviews of other records have shown Smith providing quality representation to indigent defendants. She capably represented McCamey after the voir dire through the time of the verdict. Though several officers testified that McCamey had made multiple incriminating statements, Smith in the first trial obviously cast enough doubt on this testimony that the first jury was unable to reach a verdict.

An early blunder in voir dire led to a cascade of events ultimately resulting in Smith finding herself unexpectedly in a conflict situation. To make her situation worse she was faced with a judge who was both very angry with her and very determined to "fix" the problem by getting McCamey to waive his rights. No doubt most lawyers would have a difficult time performing ably and admirably under these circumstances. The quick summons to the waiver hearing limited Smith's time to sort out the appropriate course of action. No doubt Smith feared that either asserting her client's rights or moving to withdraw would only incur further wrath. Instead of extracting Smith, to the extent possible from her ethical dilemma, by removing her as counsel and protecting McCamey's rights at the same time, the actions of the trial judge exacerbated the situation. While Smith is not blameless, neither is she the primary culprit for the damage done at the waiver hearing.

### H. *CONCLUSION AND RECOMMENDATIONS*

The undersigned finds that the holding of the Mississippi courts that McCamey's knowingly and intelligently waived his right to receive a fair trial by an impartial jury is an unreasonable application of federal law. The purported waiver is invalid both because of his attorney's conflict of interest and because it was otherwise not a knowing and intelligent waiver.

The undersigned finds Smith was operating under actual conflicts of interest in representing McCamey during the waiver hearing. As a result her performance in advising McCamey and/or otherwise protecting his rights and/or in failing to withdraw as counsel was deficient performance by Smith. The result to her client was the loss of his right to have his conviction and sentence set aside and to receive a new trial. McCamey has shown that he was prejudiced by ineffective assistance of counsel. The findings of the Mississippi courts that McCamey had waived his rights under Ground Two are completely unsupported by the record or facts in this case.

The undersigned recommends that the petition for habeas corpus be granted conditionally. The conviction of Billy McCamey should be vacated and McCamey released from custody unless the state provides him with a new trial within 120 days of the court's decision.

The parties are referred to 28 U.S.C. 636(b)(1) and Local Rule 72.1(a)(3) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections are required to be in writing and must be filed within fourteen days of this date. Failure to file written objections to the proposed finding and recommendations contained in this report within ten days from the date of filing will bar an aggrieved party from challenging on appeal both the proposed factual findings and the proposed legal conclusions accepted by the district court *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.1996).

This the 22nd day of January, 2010.